# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE

FILED

**December 15, 1997**

FOR PUBLICATION

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **Filed: December 15, 1997** |
| | ) | |
| Appellee, | ) | Hamilton County |
| | ) | |
| v. | ) | Hon. Stephen M. Bevil, |
| | ) | Judge |
| LEROY HALL, JR., | ) | |
| | ) | |
| Appellant, | ) | Supreme Court |
| | ) | No. 03-S01-9701-CR-00010 |

FOR APPELLANT:

Brock Mehler
Nashville, Tennessee
(Appeal Only)

William R. Heck
212 James Building
Chattanooga, Tennessee
(Trial and Appeal)

Karla G. Gothard
701 Cherry Street
Chattanooga, Tennessee
(Trial Only)

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Amy L. Tarkington
Assistant Attorney General
Nashville, Tennessee

William H. Cox, III
District Attorney General
Eleventh Judicial District

and

Thomas J. Evans
Assistant District Attorney General
Chattanooga, Tennessee

# O P I N I O N

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.                    DROWOTA, J.

In this capital case, the defendant, LeRoy Hall, Jr., was convicted of premeditated first degree murder and aggravated arson.[1] In the sentencing hearing, the jury found two aggravating circumstances: (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, arson." Tenn. Code Ann. § 39-13-204(i)(5) and (7) (1991). Finding that the two aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant challenged both his conviction and sentence, raising thirteen claims of error, some with numerous subparts. After fully considering the defendant's claims, the Court of Criminal Appeals affirmed the trial court's judgment. Thereafter, pursuant to Tenn. Code Ann. § 39-13-206(a)(1) (1996 Supp.),[2] the case was docketed in this Court.

The defendant raised numerous issues in this Court, but after carefully examining the entire record and the law, including the thorough opinion of the Court of Criminal Appeals and the briefs of the defendant and the State, this Court, on August, 27, 1997, entered an Order, limiting review at oral argument to four issues

---

[1] Although not raised as an issue in this appeal, the trial judge imposed a twenty-five year sentence on the conviction for aggravated arson, consecutive to the death penalty.

[2] "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court. Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

and setting the cause for the September, 1997, term of this Court in Knoxville.  See Tenn. S. Ct. R. 12.[3]

After reviewing the record, we have determined that none of the alleged errors require reversal.  Moreover, the evidence supports the jury's findings as to the aggravating and mitigating circumstances, and the sentence of death is not arbitrary or disproportionate to the sentence imposed in similar cases, considering the nature of the crime and the defendant.  Accordingly, the judgment of the Court of Criminal Appeals upholding the defendant's conviction for first degree murder and sentence of death by electrocution is affirmed.

## FACTUAL BACKGROUND

The evidence presented at the guilt phase of the trial demonstrated that around midnight on April 16, 1991, the defendant threw gasoline on the victim, Traci Crozier, his ex-girlfriend, as she was lying in the front seat of her car.  The victim received third degree burns to more than ninety percent of her body and died several hours later in the hospital.  When questioned by police, the defendant initially denied involvement in the offense.  Eventually, however, Hall admitted responsibility, but claimed that he did not intend to kill the victim; he intended to burn her car.

The victim met the defendant in December of 1984.  They began living together in January of 1986, and continuously resided together until, three weeks

_____

[3]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned.  The Court may enter an order designating those issues it wishes addressed at oral argument."

prior to her murder. On March 26, 1991, the victim left and moved into the house with her grandmother, Gloria Mathis, and her uncle, Chris Mathis. After the separation, the defendant would frequently, and often late at night, call the Mathis home in search of the victim. In the early morning hours of April 6, 1991, the Mathis household was awakened by a dog barking and looked outside to see the victim's car, a two-door Nissan Pulsar, burning. The victim's uncle saw the defendant running away from the burning car and fired a gunshot into the air. The fire department was called to extinguish the fire and investigate the arson. When the defendant called the Mathis house thereafter, the victim's uncle threatened Hall in the event he did not leave the victim alone. The defendant responded: "If I can't have her, nobody can't." [sic]

On the night of April 16, 1991, shortly before midnight, Viola Wylene Price was sitting in her car outside her home when she saw "a ball of fire" in the middle of the street. As she started to get out of her car, a black car, later identified as being similar to the defendant's, sped away from the scene. After the car passed, Price ran into her house and called 911. Her son, Billy Ray Wilson, was inside and when he heard his mother call for emergency assistance, he ran outside to see what was happening. When he saw the burning car and heard someone inside it screaming for help, Wilson ran to the driver's side of the car. Though the door was open, he could not see anyone through the flames. Wilson ran around to the passenger side of the car where he saw the victim attempting to get out through the window. Wilson pulled the victim from the car, removed her burning shoes and clothes, helped her extinguish the flames on her body, and assisted her to a safe distance from the burning car in the event of an explosion.

Price returned to the scene after calling for emergency assistance. Though the victim had been so badly burned that her hair was melted and skin was hanging from her arms, she remained coherent and alert. The victim expressed concern about her appearance and the likelihood of permanent scarring from the burns. She gave Price her name and telephone number. When Price asked the victim for the identity of the perpetrator, the victim responded, "Lee Hall." The victim also told Price that Hall twice previously had set fire to her car. The victim told Wilson that the defendant "threw gas on me, gas bomb." She repeated,"it was gas, gas bomb. He set me on fire."

Earl Atchley, Commander of the Chattanooga Fire Department, received the 911 call at 12:06 a.m. on April 17, 1991. When he arrived at the scene the victim's car was "fully involved" in fire and the victim was badly burned. Though Commander Atchley did not recognize her, the victim remembered him as the person who had investigated the burning of her car on April 6, 1991.[4] The victim told Commander Atchley that the same person was responsible for both incidents. Commander Atchley recovered a melted plastic container next to the driver's side of the victim's car, and a tupperware lid, which was not as badly melted, near the car.

The victim was taken to Erlanger Hospital where she was treated by Dr. Sonya Merriman, a plastic surgeon and burn specialist. Describing the victim's condition, Dr. Merriman stated, "She had a 95 percent, what we call a total body surface area burn, 95 percent of her body was burned, and all but about two to three percent of

---

[4]In addition to the fire on April 6, 1991, the victim's car was burned on April 1, 1991. The defendant was indicted for arson related to these fires, but the trial court severed these counts, and they were later dismissed.

that was third degree burns." The victim's teeth were charred, and the hair was burned off her body. Based upon the consistency and uniformity of the burns over the victim's entire body, except the soles of her feet, Dr. Merriman opined that the victim's body had been doused with gasoline, rather than splattered or splashed. Although Dr. Merriman had treated nearly one hundred burn cases, she had never seen a worse or more uniform pattern of burning on an individual.

The victim was treated with intravenous fluids and incisions in her body designed to allow tissue expansion. Nonetheless, the victim's condition deteriorated. Her tongue swelled until it protruded from her mouth, and her eyelids became inverted from the swelling. Despite the gravity and extent of her injuries, however, Dr. Merriman testified that the victim remained conscious. She was also in constant pain. According to Dr. Merriman, the medication administered to the victim would not have been strong enough to alleviate her pain, and the victim did not sleep for long periods of time or lose consciousness until just before her death. The victim, according to Dr. Merriman, sustained an unsurvivable burn from which there was never any chance of recovery.

Ed Forester, an investigator with the Arson Division of the Chattanooga Police Department, examined the victim's car after both the April 6 and April 16 fires. His investigation of the April 6 fire revealed that an accelerant had been poured around the exterior edges of the car which melted the fenders and bumpers. A yellow plastic jug found at the scene tested positive for gasoline. Forester obtained an arrest warrant for the defendant based, in part, upon the statements of the victim's uncle.

Forester testified that the vehicle burned on April 6 was the same automobile involved in the fire on April 16, 1991. The most extensive damage resulting from the fire on April 16 was to the driver's side of the car. The metal was discolored; the roof sagged; and the seat springs were weakened. The glass on the passenger side was fire and carbon stained; however, glass found on the driver's side had no such markings. The lack of fire or carbon staining indicated that the glass on the driver's side had been broken out before the fire was started. A melted plastic container was found near the open driver's door of the victim's vehicle. The victim's socks, shoes, and clothing remains were recovered and later tested positive for the presence of gasoline. Car keys were found some thirty feet away from the victim's car.

Mike Donnelly, an arson investigator with the State of Tennessee Fire Marshall's Office, also examined the victim's car. He found evidence of three separate fires to the car. Based upon the extent of damage, Donnelly opined that the April 16 fire had been started on the driver's side of the vehicle. Based upon his examination of the car and his review of photographs of the victim, Donnelly testified that gasoline had been poured directly onto the victim.

Testifying for the defense during the guilt phase of the trial were Morris Forester and Jeffery Scott Green. Forester and Green had been drinking with the defendant in the early evening of April 16, 1991. The trio consumed about two and one-half cases of beer and were intoxicated. Forester went to bed around 10:30 p.m. and did not see the defendant thereafter. Green recalled seeing the defendant between 10:30 and 11:00 p.m. Because he knew the defendant was intoxicated and unable to drive, Green tried to persuade the defendant to spend the night at

Forester's home.  Eventually, however, the defendant left, and neither Green nor Forester saw him again until after the murder.

The defendant also testified in his own behalf.  According to his testimony, he and the victim began living together in January of 1986, when he was eighteen and she was sixteen years old.  Even though the victim moved out in March of 1991, they continued to see one another after the separation.  The defendant said he was upset by the separation, and as a result, had been drinking and smoking crack cocaine.  On the day of the murder, Hall and Green went directly to Forester's house and began drinking beer.  At one point, Hall left and obtained a hammer at a pawn shop.  After attempting to call the victim several times, without success, Hall returned to Forester's home about 6:30 p.m. or 7:00 p.m. and continued drinking.

Hall consumed approximately one case of beer, then left  Forester's home, taking with him five more cans of beer.  After purchasing another six cans of beer, Hall drove to the mobile home he had shared with the victim and destroyed some of her possessions because he was angry with her for not coming home.  Hall left the trailer after a short time and took with him a two-quart tea jug which he intended to use to burn the victim's car.  Searching for the victim and her car, Hall drove by her work place, her grandmother's house, and several bars, but he did not find her.  Hall was threatened by the victim's uncle and a second man whom he did not know when he drove by the victim's grandmother's house.  Thereafter, Hall stopped at a service station, filled the tea jug with gasoline, and purchased a cigarette lighter.  Hall removed paper towels from a dispenser near the gas pumps, placed them in the

opening of the tea jug, put the container in his car, and returned to the area near the victim's grandmother's house.

As Hall was preparing to leave the neighborhood, he encountered the victim as she drove up in her car. According to Hall, he left his car and entered the victim's car on the driver's side to talk. Hall asked her to move back in with him and told her that he was drunk and needed her. He asked the victim if she was pregnant and told her that she could not have another abortion. Finally, Hall questioned why he had been blamed for the earlier burnings of her car. An argument ensued. The victim called the defendant a "crazy S.O.B.," and told him to turn himself into the authorities.

At that point, Hall got out of her car and told the victim to do likewise because he was going to burn it. When the victim tried to lock the door, Hall reached inside the car, grabbed the keys, threw them towards his car, and ordered the victim to get out of her car. Hall then ran to his car and grabbed the jug of gasoline. He ignited the paper towels and threw the jug into the driver's side of the victim's car. The defendant knew the victim was lying in the front seat crying when he threw the gas bomb into the car.

According to the defendant, after he threw the gasoline jug, the victim came running toward him, out of the burning car, and caught him on fire. The defendant extinguished the flame on himself and then just looked at the victim, who according to the defendant, ran to the passenger's side of the car, and rolled on the ground. Unsure of what to do and believing that the fire on the victim was almost extinguished, the defendant drove away from the scene. Although he claimed to

have returned two or three minutes later, he did not see the victim, and he fled again when a black shadowy figure ran toward him.

On cross-examination, the defendant denied pouring gasoline onto the victim, claiming that it splattered on her when he threw the jug into the car. He also denied breaking the glass on the driver's window, insisting that the door was open. He proclaimed that he loved the victim and intended only to burn her car. The defendant admitted that he initially denied the offense when questioned by police. He also claimed to the police that he never meant to hurt the victim and had the gas bomb for protection from the victim's uncle, but he threw it at the victim after she laughed at him.

Based upon the proof summarized above, the jury found the defendant guilty of first degree premeditated murder and aggravated arson.[5]

The trial proceeded to the sentencing phase on the conviction for first degree murder. The State presented only one witness, Detective Ed Forester who had investigated and obtained warrants for Hall's arrest for the burning of the victim's car on April 1 and 6, 1991.[6] According to Forester, at the time of the victim's murder, the

---

[5]The defendant went to trial on three charges: (1) first degree murder by an unlawful, intentional, premeditated and deliberate killing, (2) first degree murder by a reckless killing committed during the perpetration of arson (felony murder), and (3) aggravated arson. He entered guilty pleas before the jury to arson and felony murder. After the trial court refused to accept the guilty pleas, the defendant persisted in admitting guilt to those crimes before the jury, contesting only the charge that the killing was premeditated and deliberated. At the conclusion of the proof, the trial court instructed the jury that it could return a guilty verdict for either felony murder or premeditated murder, but not for both. Acting in accordance with the instructions, the jury found the defendant guilty of aggravated assault and premeditated first degree murder. The jury did not report a verdict on the charge of felony murder.

[6]See Footnote 4, supra.

defendant was aware that he was a suspect in the April 1 and 6 incidents.  Forester also testified that the victim had given a statement following the April 6 fire in which she said that Hall previously had threatened to kill her and to "total" her car, and, on one prior occasion, actually had tried to force her off the road.[7]

The proof for the defense at sentencing included the testimony of Dr. Roger Meyer, a clinical psychologist, who evaluated the defendant after his arrest for this murder.  Dr. Meyer interviewed Hall for three hours and reviewed the results of tests administered to Hall by one of Dr Meyer's associates.

Dr. Meyer testified that a mental status examination revealed that the defendant was not insane or psychotic.  A Slosson Intelligence test indicated that the defendant's IQ was eighty-seven, and that his mental age was thirteen years, eleven months.  The defendant's basic skills, as measured by a Wide Range Achievement test, showed a grade level 6 to 9 education in the general areas of reading, spelling, and arithmetic.  A neuropsychological examination did not reveal any evidence of significant neurological trauma to Hall's brain.  A sixteen-factor personality test revealed that Hall is introverted, emotionally unstable, easily influenced, and has low self-esteem.  According to Dr. Meyer, the test reflects that the defendant has little self-control and is not rule abiding or moralistic.  Though the defendant is not a psychopath or sociopath, Dr. Meyer opined that Hall has problems controlling rage and anger.

---

[7]This evidence was admitted during the sentencing phase as part of the prosecution's attempt to establish the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(6), which provides that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another."  The jury, however, rejected this factor.

-11-

A Rorschach "Ink Blot" test showed that Hall has a great deal of difficulty reacting appropriately to stressful situations. Dr. Meyer described Hall and the victim's relationship as an "emotional tug of war," and said that it would have created a great deal of tension and frustration in a person with the defendant's psychological makeup. Though some of the test results indicated that the defendant was "faking bad" or malingering, Dr. Meyer explained that such results do not necessarily mean that a patient is faking, but can also reflect that a patient is simply overemphasizing the stress and emotional problems he or she is experiencing.

Dr. Meyer diagnosed the defendant as suffering from borderline personality disorder. Dr. Meyer testified that persons with this disorder characteristically have severe emotional problems and problems with thinking and judgment. Dr. Meyer also concluded that the defendant suffered from post-traumatic stress disorder, but admitted that it may have resulted from the circumstances of the victim's death.

On cross-examination, Dr. Meyer testified that the defendant is not mentally retarded. He also conceded that his conclusions about the defendant's mental condition were based, at least in part, upon a typographical error indicating that the defendant's IQ was seventy-eight (78), rather than eighty-seven (87). Despite his reliance upon this erroneous information, Dr. Meyer did not revise his conclusions about the defendant. He restated his diagnosis that the defendant exhibited signs often associated with borderline personality disorder and post-traumatic stress disorder and said that the defendant was under extreme emotional distress when he committed the murder in this case.

Dr. Meyer admitted, however, that he did not discuss the facts of the murder with the defendant, but considered only the events which occurred before and after the killing in making his diagnosis. Dr. Meyer also did not reconsider his diagnosis after receiving an investigator's report which chronicled the defendant's behavior since childhood. Dr. Meyer admitted that the behavior described in the report would support a diagnosis of antisocial personality disorder. The behavior included the defendant's burning of his own bed in 1972, setting fire to his mother's boyfriend's car seat in 1973, setting fire to a wooded area in 1975, driving under the influence of an intoxicant, fighting, sneaking up on his mother's boyfriend with a knife, and truancy.

In addition to Dr. Meyer's testimony, the defense also presented proof about the relationship between Hall and the victim and about the defendant's abuse of drugs and alcohol. For example, Green testified that the victim and the defendant had a "rocky" relationship and that the defendant abused alcohol, marijuana, and crack cocaine. The defendant's cousin testified that Hall came to live with him in Oklahoma in December of 1990 seeking employment and recovery from drug abuse, but the victim telephoned, and shortly thereafter, Hall returned to Tennessee.

Christie Griffin, the defendant's step-sister, testified that Hall was very sad when he and the victim were at odds, but always believed they could work through their problems. According to Griffin, Hall and the victim had been out together several times following their separation in the weeks prior to the murder. Griffin stated on cross-examination that she observed the defendant hiding his shirt when he returned to his mother's home on the night of the victim's murder. In fact, Griffin had told the police where the shirt had been hidden.

The defendant's brother, David Hall, said that the defendant and the victim argued once a week, and the victim would address the defendant in abusive and vulgar language. According to his brother, the defendant was abusing crack cocaine during the time period of the murder, and had been for sometime prior to the murder. To support that drug habit, Hall would borrow money and pawn property.

The defendant's mother, Sarah Griffin, testified that her family had moved several times when Hall was young. When Hall's family moved to Alabama, he was only fourteen years old, but he remained in the Chattanooga area, residing with another family for three years until his own family returned. According to Hall's mother, the victim and her son began having problems two years before the murder. The couple had separated and reconciled on several occasions. She recalled that in December of 1990, the defendant moved to Oklahoma, where he planned to find employment and help for his drug problem, but returned in early January of 1991 to reconcile with the victim. During the separation preceding the murder, Griffin testified that Hall was very upset and would often cry and drink alcohol in excess. Although the victim and the defendant were separated, they had been out together several times in the weeks before the murder. According to Griffin, Hall was a "basket case" when he was unable to see the victim.

Finally, the defense introduced medical records and insurance forms to establish that the victim had undergone two abortions in 1985 and one abortion in 1990. The prosecution, in rebuttal, presented the testimony of a friend of the victim who related that Hall was aware of one of the abortions in 1985 and had encouraged the victim to undergo the procedure.

Based upon the proof, the jury determined that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, arson." Tenn. Code Ann. § 39-13-204(i)(5) and (7) (1991). In addition, the jury found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the jury's verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors assigned by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

## EXPERT TESTIMONY

In this Court, the defendant first contends that he is entitled to a new trial because during the guilt phase of the trial, the trial court refused to admit the expert proof regarding his mental state at the time the offense was committed. The defendant asserts that the testimony of Dr. Roger Meyer was relevant to negate intent, an essential element of premeditated first degree murder,[8] the offense for which the defendant was convicted. Exclusion of the relevant evidence constitutes prejudicial error, the defendant argues, and entitles him to a new trial. The State responds that the trial court properly excluded Dr. Meyer's testimony at the guilt

_____

[8]At the time this offense was committed, Tenn. Code Ann. § 39-13-202(a)(1) (1991) provided that the "intentional, premeditated and deliberate killing of another" constitutes first degree murder. The definition was amended in 1995 and first degree murder is now defined as "the intentional and premeditated killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1991 & Supp. 1996).

phase because the defendant's proffer failed to inform the trial court that the testimony was being offered to negate intent. The State also asserts that the substance of Dr. Meyer's testimony was not relevant to show that the defendant lacked the capacity to form the requisite intent to commit premeditated first degree murder.

In resolving this issue we must revisit a principle recently endorsed by this Court in State v. Abrams, 935 S.W.2d 399 (Tenn. 1996). In that case, we approved the "general holding" of State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994), that "evidence of a defendant's mental condition can be relevant and admissible in certain cases to rebut the mens rea element of an offense." Abrams, 935 S.W.2d at 402. We deferred until "another day" further development of the rule of "'diminished capacity.'" Id. Another day has arrived.

We begin with a brief historical review. The rule of diminished capacity originated in Scotland more than a century ago and was designed "to reduce the punishment of the 'partially insane' from murder to culpable homicide, a non-capital offense." State v. Wilcox, 436 N.E.2d 523, 525 (Ohio 1982). The doctrine was widely accepted in other countries before it gained acceptance in American jurisdictions. Id. In modern application, diminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. United States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990). Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. State v.

-16-

Padilla, 347 P.2 312 (N.M. 1959). In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state. "Properly understood, it is . . . not a defense at all but merely a rule of evidence." United States v. Pohlot, 827 F.2d 889, 897 (3rd Cir. 1987).

It was that proper description of "diminished capacity" that was adopted by the Court of Criminal Appeals in Phipps. Indeed, while recognizing that diminished capacity is not an enumerated defense under the 1989 revision of the criminal code. See Tenn. Code Ann. §§ 39-11-501--621 (1991 Repl. & Supp. 1996), the Court of Criminal Appeals in Phipps concluded that a defendant's capacity to form the requisite mental state to commit an offense is an issue in criminal prosecutions because the general criminal law in Tennessee provides that "[n]o person may be convicted of an offense unless . . . [t]he culpable mental state required is proven beyond a reasonable doubt," Tenn. Code Ann. § 39-11-201(a)(2) (1991 Repl.). We agree with that conclusion, and in addition observe that the negation of an element of a criminal offense is recognized as a defense in Tennessee. Tenn. Code Ann. § 39-11-203(e)(2) (1991 Repl & Supp. 1996) ("A ground of defense, other than one (1) negating an element of the offense. . . ") (emphasis added).

Under Tennessee law, evidence is deemed relevant if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401 Moreover, relevant evidence is generally admissible in Tennessee, unless its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid.

402 and 403. Since the general criminal law requires that mental state be proven by the State beyond a reasonable doubt, it is certainly a "fact of consequence" to the outcome of a criminal prosecution. Therefore, evidence which tends to prove or disprove the required mental state is relevant and generally admissible under Tennessee law.

In addition to the general relevance rules, expert testimony in Tennessee is governed by Rule 702, Tenn. R. Evid. which provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Under this evidentiary rule, expert testimony regarding the defendant's incapacity to form the required mental state must "substantially assist the trier of fact to understand the evidence or to determine a fact in issue." See State v. Shuck, __ S.W.2d __ (Tenn. 1997). Though the facts or data upon which the expert testimony is based need not be admissible in evidence, they must be made known to the expert at or before the hearing and must be of a type reasonably relied upon by experts in the particular field. Rule 703, Tenn. R. Evid. In fact, under Tennessee law, "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Rule 703, Tenn. R. Evid. Of course, as with most other evidentiary questions, the admissibility of expert opinion testimony is a matter which largely rests within the sound discretion of the trial court. State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

Therefore, to gain admissibility, expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony. Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law. As the intermediate court recognized

> [t]o find otherwise would deprive a criminal defendant of the right to defend against one of the essential elements of every criminal case. In effect, then, such a finding would deprive the defendant of the means to challenge an aspect of the prosecution's case and remove the burden of proof on that element in contravention of constitutional and statutory law. While the law presumes sanity it does not presume mens rea. Due process requires that the government prove every element of an offense beyond a reasonable doubt.

Phipps, 883 S.W.2d at 149. To avoid confusion, however, we caution that such evidence should not be proffered as proof of "diminished capacity." Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried.[9]

As did the Court of Criminal Appeals in this case, we emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just

---

[9]Our holding closely resembles the American Law Institute's Model Penal Code which does not mention the term "diminished capacity," but nevertheless provides that "[e]vidence that the defendant suffered from a mental disease or defect shall be admissible whenever it is relevant to prove that the defendant did or did not have the state of mind which is an element of the offense." A.L.I. Model Penal Code § 4.02 (1) (Official Draft 1962). The Comment to that Section explains: "[i]f states of mind such as deliberation or premeditation are accorded legal significance, psychiatric evidence should be admissible when relevant to prove or disprove their existence to the same extent as any other relevant evidence."

a particular emotional state or mental condition. It is the showing of a lack of <u>capacity</u> to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue. <u>State v. Shelton</u>, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992), perm. app. denied (Tenn. 1993). Applying the above stated principles to the facts of this case, we conclude that the trial court did not err in excluding the testimony of Dr. Meyer.

After the State rested its case-in-chief in the guilt phase of the trial, defense counsel requested the trial court to rule on whether or not Dr. Meyer's testimony could be admitted. The trial court inquired about the nature of the testimony and the purpose for which it was being offered. The following discussion ensued.

> [DEFENSE COUNSEL]: Talking about the type of individual that -- what his testing revealed about the defendant in this case, and then take him to the situation where -- I mean there's going to be proof -- there's already been proof put on about alcohol consumption, and what that consumption -- what effect that consumption would have had on him with his type of personality, in addition to exploring his state of mind, given his personality makeup, posing facts that have been presented here in court about the incident and how it occurred, what his expert opinion would be about how he would react under those circumstances.
>
> [THE COURT]: <u>I don't understand -- of course, state of mind is important if it goes to a defense. If it goes to negating key elements in the case --</u>
>
> [DEFENSE COUNSEL]: Intent, Your Honor.
>
> [THE COURT]: But just general state of mind, what his feelings are, what his attitude was toward the victim in general, I don't see how that particular state of mind contributes toward a defense. I assume at this time, based on what I've heard up to this point, his defense is intoxication, and he could not form the requisite intent to premeditate and deliberate and commit an intentional murder. Is that correct?
>
> [DEFENSE COUNSEL]: Well, it's not only with reference to intoxication, but it's also with reference to emotional distress and stress that was produced by the relationship between the parties.

(Emphasis added.)

After further discussions, the trial court ruled as follows:

> Anything going towards state of mind that would create a defense or an excuse for this killing, the Court will allow. But just a general state of mind of the defendant about attitudes toward the deceased, I don't think it's relevant at this time. I don't think it's admissible. I'm not going to allow that testimony about drugs and whatever between the two people just to show generally what the defendant was thinking, unless it goes specifically toward a defense. And, as I understand what you said, it does not.
>
> Also, the law of the State of Tennessee does not recognize diminished capacity in this state. And the only relevancy I see as far as the doctor's testimony would be going toward insanity as a defense in this case and not as to diminished capacity.
>
> Now, as far as the defense of intoxication, if there is credible testimony from the doctor and he can give an opinion as to the extent of the state of intoxication of Mr. Hall at the time of commission of the offense, then that would be relevant, but just general stress or general attitude toward life would not be a defense in this case. Any testimony going toward the defense of intoxication, I will allow. . . .

(Emphasis added.)

Following this ruling, the defense did not attempt to present Dr. Meyer's testimony as an offer of proof, nor did the defense make any further statement about the nature and purpose of the testimony.[10] It is clear from this ruling that the trial court did not bar Dr. Meyer from testifying, but actually stated that he would allow testimony probative either to negate intent or to establish intoxication. In fact, the trial

---

[10]It is not clear from the record why defense counsel chose not to make a testimonial offer of proof. Whenever counsel sought to do so during this trial, the trial court appropriately granted the request. We have repeatedly stressed the importance of an offer of proof. Not only does it ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded. State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1987); State v. Goad, 707 S.W.2d 846, 853 (Tenn. 1986). However, in this case, we can review the issue based upon the substance of Dr. Meyer's testimony at the sentencing hearing.

-21-

court recognized, without the benefit of appellate court decisions, that expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.[11]  Moreover, the trial court correctly applied that legal principle to the testimony in this case.  From the description of the expert testimony offered by the defense, as well as a review of the testimony of Dr. Meyer at the penalty phase, it is clear that Dr. Meyer's testimony was not relevant to show that the defendant lacked the capacity to form the requisite intent because of mental disease or defect or intoxication.

Instead, Dr. Meyer testified generally about the defendant's personality type and character traits which he gleaned from tests results and a single three hour interview.  At no point in his testimony did Dr. Meyer state that the defendant lacked the capacity to premeditate and deliberate the killing because of a mental disease or defect.  Though Dr. Meyer testified at the penalty phase that he believed the defendant to have a borderline personality disorder and that such people could have brief episodes of rage during "temporary states of mental illness," he did not state that the defendant was experiencing such an episode when he committed the murder for which he was on trial.  In fact, had Dr. Meyer made such a statement it would have been suspect since he acknowledged that he never discussed the facts of the murder with the defendant.[12]  While evidence that a particular defendant, because of a mental disease or defect, lacks the capacity to form the requisite intent is

---

[11]The trial court in this case did not have the benefit of Shelton, Phipps, or Abrams, when this ruling was made.

[12]Though not pertinent to admissibility, we note that Dr. Meyer's testimony was greatly weakened by his admission that his conclusions were partially based upon inaccurate and incomplete information, and his refusal, despite that fact, to revise his conclusions.

admissible in Tennessee, expert opinion testimony about the typical reactions of certain personality types is not relevant to the capacity of the particular defendant on trial. Compare Ballard, 855 S.W.2d at 561 (expert testimony describing the typical behavior of a sexually abused child does not substantially assist a jury in an inquiry of whether the specific crime charged has actually taken place). Moreover, proof of personality type is not relevant to a defendant's capacity to form the mental intent. As Judge Tipton correctly stated in the decision of the Court of Criminal Appeals in this case:

> Society is comprised of myriad individuals with diverse personalities and temperaments who are jointly and severally bound by society's common codes of conduct and responsibility. The mere fact that one is more apt, by personality type, to become emotional in response to a particular stimulus does not provide a means for that person to be absolved from the same responsibility to which the law holds another who might be less apt to respond as passionately to the same stimulus. If it did, then each person would be the law unto him or herself based solely upon his or her particular personality makeup.

Though expert testimony is admissible to show that because of a mental disease or defect, a defendant lacked the capacity to form the mental state required to constitute the offense for which he or she is being tried, the testimony in this case did not meet that standard. The trial court appropriately excluded the evidence.

**AGGRAVATING CIRCUMSTANCES**

The defendant next challenges the validity of the aggravating circumstances found by the jury. First, he argues that unconstitutional double counting exists in this case because the separate aggravating circumstances were proven by the same underlying facts, the burning of the victim's car. Secondly, he asserts that the jury's

finding that the murder occurred in the perpetration of a felony is inconsistent with its verdict of premeditated first degree murder, and he urges that there was not a sufficient nexus between the felony and the homicide.

In State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992) (Drowota and O'Brien, JJ., dissenting), a majority of this Court concluded that when a defendant is "convicted of first-degree murder solely on the basis of felony murder, the aggravating circumstance set out in Tenn. Code Ann. §§ 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991) does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the United States Constitution, and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense." The decision in Middlebrooks was based upon the narrow principle that an aggravating circumstance may not duplicate the elements of the underlying death-eligible offense. Contrary to the defendant's assertion, Middlebrooks did not embrace the broad principle of double counting, which has been adopted by the Florida courts,[13] and which precludes the use of the same evidence to establish more than one aggravating circumstance. See State v. Bush, 942 S.W.2d 489, 505 (Tenn. 1997) (holding that use of murder to prevent arrest aggravating circumstance was appropriate because it did not duplicate the statutory elements of the underlying offense); State v. Stephenson, 878 S.W.2d 530, 556-57 (Tenn. 1994) (holding that use of the murder for renumeration aggravating circumstance was appropriate because it did not duplicate the statutory elements of the underlying offense). In any event, we observe that the jury's finding of the two aggravating circumstances, (1)

---

[13]See e.g. Provence v. State, 337 So.2d 783 (Fla. 1976).

"[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed while the defendant was engaged in committing or was attempting to commit, arson," Tenn. Code Ann. § 39-13-204(i)(5) and (7) (1991), were not based upon the same evidence. The jury's finding of the (i)(5) circumstance was based upon the torturous means by which the defendant chose to kill the victim, and the suffering she endured prior to her death. The jury's finding of the (i)(7) circumstance was based upon the defendant's commission of the murder during the perpetration of a separate felony, the destruction of the victim's car by arson.

As to the defendant's contention that the finding of the felony murder aggravating circumstance is inconsistent with its verdict of premeditated murder, we disagree. As previously explained, in Middlebrooks a majority of this Court held that application of the felony murder aggravating circumstance is inappropriate only if the defendant is convicted solely on the basis of felony murder. Implicit in that statement is the recognition that the circumstance properly may be applied if a defendant is convicted of premeditated first degree murder. In fact, we recognized in State v. Hurley, 876 S.W.2d 57, 70 (Tenn. 1993), that premeditated and felony murder are simply alternative means by which the offense of first degree murder may be committed. While a defendant who murders one victim may only be convicted of one offense of first degree murder, the circumstances of a particular case may support a jury finding that the offense of first degree murder was committed both with premeditation and during the course of perpetrating another felony. Tenn. Code Ann.

§ 40-18-112 (1990 Repl.).[14] Indeed, that was the situation in <u>Hurley</u> where we affirmed the defendant's conviction of premeditated first degree murder and his death sentence based upon the felony murder aggravating circumstance.

In this case, the defendant admitted that he intended to burn the victim's car, while at the same time denying that he intentionally, with premeditation and deliberation, killed the victim. The jury convicted the defendant of both aggravated arson and premeditated first degree murder, obviously disbelieving his assertions that he did not intend to kill the victim. The fact that the victim's murder was accomplished by pouring gasoline onto her body at the same time as gasoline was applied to the car to accomplish the underlying felony does not vitiate the applicability of the aggravating circumstance. In fact, application of the felony murder aggravating circumstance is particularly appropriate in this case. The defendant relentlessly searched for the victim's car intending to burn it. When he found the object of his search with the victim inside, the defendant achieved his original purpose, arson of the victim's car. When the victim would not heed his warning to leave the car, the defendant refused to be deterred from his original purpose and then proceeded, with premeditation and deliberation, to murder the victim by pouring gasoline directly onto her body and igniting the accelerant. The defendant's relentless determination to commit the arson of the victim's car ultimately culminated in his decision to kill her. Accordingly, the evidence is sufficient to support the jury's finding that the

---

[14]"Where the intent with which, the mode in, or the means by which, an act is done, are essential to the commission of the offense, and such offense may be committed with different intents, in different modes, or by different means, if the jury is satisfied that the act was committed with one (1) of the intents, in one (1) of the modes, or by either of the means charged, it shall convict, although uncertain as to which of the intents charged existed, or which mode, or by which of the means charged, such act was committed."

premeditated murder in this case was committed while the defendant was also engaged in committing arson.

The defendant's claim that there is an insufficient nexus between the arson and the murder is without merit. In State v. Terry, 813 S.W.2d 420 (Tenn. 1991), the defendant, a church pastor, embezzled substantial sums of money from his congregation over a period of time. He began taking the money in March of 1987, In June of 1987, he killed the church handyman, placed the body inside the church building, and torched the building. At the sentencing hearing, the jury found the felony murder aggravating circumstance on the basis of the underlying larceny. The trial judge granted the defendant's motion for a new trial, finding that the State had failed to prove that the murder was committed while the defendant was engaged in the perpetration of larceny. This Court agreed with the trial judge that there was an insufficient nexus between the murder and the larceny. In so holding, we stated that application of the felony murder aggravating circumstance depends upon the temporal, spatial and motivational relationships between the capital murder and the collateral felony. Id. at 423.

Applying those factors to the circumstances of this case, it is clear that the defendant's argument is without merit. Here, the capital murder and collateral felony occurred at the same time and in the same place. The defendant's motivation for killing the victim in this case and burning her car were likewise the same, anger over her decision to discontinue their relationship.

We conclude that the evidence is sufficient to support the jury's findings as to aggravating circumstances. We also conclude that the aggravating circumstances were constitutionally applied in this case.

## NONSTATUTORY MITIGATING CIRCUMSTANCES

In 1989, the General Assembly amended the capital sentencing statute to provide, with respect to nonstatutory mitigating circumstances, as follows:

> After closing arguments in the sentencing hearing, the trial judge shall include in the instructions for the jury to weigh and consider any of the statutory aggravating circumstances set forth in subsection (i) which may be raised by the evidence at either the guilt or sentencing hearing, or both. The trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing or both which shall include, but not be limited to, those circumstances set forth in subsection (j). No distinction shall be made between mitigating circumstances as set forth in subsection (j) and those otherwise raised by the evidence which are specifically requested by either the state or the defense to be instructed to the jury. These instructions and the manner of arriving at a sentence shall be given in the oral charge and in writing to the jury for its deliberations.

Tenn. Code Ann. § 39-13-204(e)(1) (1991 Repl. & 1996 Supp.).

In this Court, the defendant argues that the trial court violated that statute by refusing to instruct the jury with respect to nonstatutory mitigating circumstances. The offense for which the defendant was tried and convicted was committed after November 1, 1989, so the above statute is without question applicable to his case. However, the case was tried before this Court's decision in State v. Odom, 928 S.W.2d 18 (Tenn. 1996), in which we first interpreted the amended statute to require jury instructions on nonstatutory mitigating circumstances raised by the evidence and proffered by a defendant as having mitigating value. There, we stated that

instructions on nonstatutory mitigating circumstances must not be fact specific and imply to the jury that the judge has made a finding of fact. Instead, such instructions must be drafted so that they are indistinguishable from the statutory mitigating circumstances when considered by a jury. Id. at 32. Finally, we interpreted the "no distinction" portion of the statute to preclude the trial judge from revealing to the jury that a request for instruction on nonstatutory mitigating circumstances has been made, and from revealing the identity of the party making the request. Id. More recently, in State v. Hodges, 944 S.W.2d 346 (Tenn. 1997), we stated that nonstatutory mitigating circumstances must be phrased in general categories similar to the statutory mitigating circumstances, and we emphasized that a trial judge has no duty to give such instructions absent a timely and proper request from the defense. If the defense proffers a timely, but overly specific requested instruction, the trial court must revise and generalize the instruction to conform to the evidence and the law. Id at 356.

Of course, the trial court in this case ruled without the benefit of our decisions in Odom and Hodges. In denying the defendant's requests, the trial court relied upon decisions of this Court interpreting pre-1989 law which found no constitutional or statutory provision mandating instruction on nonstatutory mitigating circumstances. State v. Thompson, 768 S.W.2d 239 (Tenn. 1989); State v. Wright, 756 S.W.2d 669 (Tenn. 1988). The defendant argues that he is entitled to a new sentencing hearing because the trial court's denial of his request constitutes prejudicial error.

The State argues that the trial court's refusal to charge the jury on nonstatutory mitigating circumstances does not require reversal. The State first points to a statute

enacted while this case has been pending on appeal and effective April 29, 1997, which amends Tenn. Code Ann. § 39-13-204(e)(1), quoted above, by deleting the sentence "No distinction shall be made between mitigating circumstances as set forth in subsection (j) and those otherwise raised by the evidence which are specifically requested by either the state or the defense to be instructed to the jury" and substituting instead the following language at the end of subsection (e)(1): "However, a reviewing court shall not set aside a sentence of death or of imprisonment for life without the possibility of parole on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not enumerated in subsection (j)." 1997 Tenn. Pub. Acts, Chapter 139. While conceding that the statute was not applicable at the trial of this cause, the State nonetheless argues that the provision precluding a reviewing court from setting aside a sentence of death on the ground that the trial court did not instruct the jury on nonstatutory mitigating circumstances is binding in this appeal and prevents this Court from granting relief to the defendant, even if it concludes that the failure to charge nonstatutory mitigating circumstances constitutes error which affirmatively appears to have affected the verdict. Hodges, 944 S.W.2d at 352; Tenn. R. Crim. P. 52(a). Even if this Court determines that Public Chapter 139 does not apply to the appeal of this case, the State argues that the defendant is not entitled to relief because the trial court's refusal to give instructions on nonstatutory mitigating circumstances was harmless error. For the reasons that follow, we conclude that the error was harmless and does not require reversal.[15]

---

[15]Because of our conclusion that the error was harmless in this case, we do not address the separation of powers question which arises from the State's assertion that Public Chapter 139 divests reviewing courts of authority to grant relief in a case regardless of a conclusion that prejudicial error has resulted from the failure to give instructions on nonstatutory mitigating circumstances. In reserving this issue for another day, we are mindful of our duty to resolve

In this case, the defendant submitted seventy-one special requests for jury instructions at trial, many of which purported to explain the role and purpose of mitigating circumstances to the jury. Though the trial court refused to grant any of the defendant's requested instructions on nonstatutory mitigating circumstances, he granted five[16] of the other requested instructions, one which stressed that the sentencing decision was to be made by each individual juror; one which emphasized that the defendant was entering the penalty phase of the trial with the presumption that there were no aggravating circumstances warranting a sentence of death; and three other instructions which broadly defined and explained the nature and function of mitigating circumstances. With respect to the remaining sixty-six special requests the trial court stated, "I found that many of them are already included in the charge that the Court is giving . . . or some of them are what I felt like are . . . repetitious . . . . . And I've also found that many of them are not appropriate as far as accurate statements of the law."

Implicitly conceding the accuracy of the trial court's finding with respect to duplicity, in this Court the defendant points to only seven requested instructions on nonstatutory mitigating circumstances which he says the trial court erroneously refused to charge. They are as follows:

> Special Request No. 20. In determining the sentence for Leroy Hall, Jr. you shall consider as a mitigating circumstance the fact that Leroy Hall, Jr., was immature for his age, and lacked the normal emotional

---

constitutional conflicts only when absolutely necessary for a determination of the case and the rights of the parties. Owens v. State, 908 S.W.2d 923 (Tenn. 1995).

[16]The trial judge granted Special Request No. 4, Decision To Be Made By Individual Jurors; Special Request No. 12, Presumption Regarding Aggravating Circumstances; Special Request No. 57, Mitigation-Definition, Weight, Unanimity; Special Request No. 58, Mitigation-Definition; Special Request No. 59, Mitigation-Definition.



development at the time of the commission of the crime. This may be sufficient by itself to impose the punishment of life imprisonment and reject death by electrocution.

Special Request No. 21. In determining the sentence for Leroy Hall, Jr. you shall consider as a mitigating circumstance the fact that Leroy Hall, Jr.'s criminal activity was caused by various psychological factors and alcohol-related problems that can be treated and will diminish with age. This may be sufficient by itself to impose the punishment of life imprisonment and reject death by electrocution.

Special Request No. 26. In determining the sentence for Leroy Hall, Jr. you shall consider as a mitigating circumstance the fact that Leroy Hall, Jr. suffers from post-traumatic stress disorder even though it did not cause the crime. This may be sufficient by itself to impose the punishment of life imprisonment and reject death by electrocution.

Special Request No. 27. In determining the sentence for Leroy Hall, Jr. you shall consider as a mitigating circumstance the fact that Leroy Hall, Jr. at a very early age, exhibited signs of mental or emotional disturbance that went untreated. This may be sufficient by itself to impose the punishment of life imprisonment and reject death by electrocution.

Special Request No. 30. In determining the sentence for Leroy Hall, Jr. you shall consider as a mitigating circumstance the fact that . . Leroy Hall, Jr. never developed the ability to cope with daily tensions or to become self-dependent. This may be sufficient by itself to impose the punishment of life imprisonment and reject death by electrocution.

Special Request No. 37. In determining the sentence for Leroy Hall, Jr. you shall consider as a mitigating circumstance the fact that . . Leroy Hall, Jr. has for a long time had serious personality disorders that are, to a large extent, caused by the problems that developed in his childhood with his family. This may be sufficient by itself to impose the punishment of life imprisonment and reject death by electrocution.

Special Request No. 45. In determining the sentence for Leroy Hall, Jr. you shall consider as a mitigating circumstance the fact that Leroy Hall, Jr. has a history of family instability.

Assuming the refusal to give these instructions, in some form, was error pursuant to our pronouncements in Odom and Hodges, we must determine whether the error affirmatively appears to have affected the verdict. A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it

misleads the jury as to the applicable law. <u>Hodges</u>, 944 S.W.2d at 352. In evaluating

claims of error in jury instructions, the United States Supreme Court has cautioned

reviewing courts to remember that

> [j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

<u>Boyde v. California</u>, 494 U.S. 370, 380-81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316

(1990); <u>see</u> <u>also</u> <u>State v. Van Tran</u>, 864 S.W.2d 465, 479 (Tenn. 1993). We review

the following jury charge regarding mitigating circumstances to determine if it fairly

submitted the legal issues to the jury in this case.

> <u>Mitigating Circumstances</u>
> Tennessee law provides that in arriving at the punishment, the jury shall consider as heretofore indicated, any mitigating circumstances which shall include, but are not limited to, the following:
>
> (1) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.
>
> (2) The youth or advanced age of the defendant at the time of the crime.
>
> (3) The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment.
>
> (4) any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

No distinction shall be made between mitigating circumstances one (1) through four (4) and those otherwise raised by the evidence.

The defendant does not have a burden of proving a mitigating circumstance. If there is some evidence that a mitigating circumstance exists, then the burden of proof is upon the state to prove, beyond a reasonable doubt, that mitigating circumstance does not exist.

There is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance.

Special Request No. 4: Decision to be Made by Individual Jurors:

Both the prosecution and Leroy Hall, Jr., are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors. Do not decide any question in a particular way simply because a majority of the jurors, or any one of them, favors such a decision. Do not decide any issues in this case by chance, such as the drawing of lots or by any other chance determination.

Special Request No. 12: Presumption Regarding Aggravating Circumstances:

The defendant enters this phase of the trial with the presumption that there are no aggravating circumstances that would warrant a sentence of death. This presumption may be overcome only if the prosecution convinces you beyond a reasonable doubt that one or more of the specified aggravating circumstances exists and that the aggravating circumstance or circumstances outweigh any mitigating factors.

Special Request No. 57: Mitigation-Definition, Weight, Unanimity:

When you deliberate on the punishment for Leroy Hall, Jr., life imprisonment or death by electrocution, you must consider any mitigating circumstance supported by any evidence presented by either party at either the guilt-innocence or sentencing phase, or both, of the trial. A mitigating circumstance is any aspect of Leroy Hall, Jr's., character, background history, or physical condition or the nature and circumstances of the crime which in fairness or mercy, calls for a sentence less than death. If you find that there are any mitigating circumstances, you must decide how much weight they deserve. The law does not identify or limit what you can consider concerning Leroy Hall, Jr's., character, background history, and physical condition or the nature and circumstances of the crime that are mitigating. The law does not impose a formula for determining how much weight a mitigating circumstance deserves. Each of you is the sole judge of

whether mitigating circumstances exist and if so, how much weight they deserve.

You may deliberate as a body about mitigating circumstances, but you are not required to reach a unanimous verdict as to their existence or weight. When you vote on whether any aggravating circumstances have been proven beyond a reasonable doubt to outweigh mitigating, each of you must decide for yourself whether any mitigating circumstances exist and, if so, how much weight they deserve.

Special Request No. 58: Mitigation-Definition:
Mitigating circumstances are factors put forth to show that the appropriate sentence is life imprisonment. Mitigating circumstances are not a justification or excuse for the offense, but are factors that, in fairness and mercy, may extenuate or mitigate the degree of moral culpability as far as punishment is concerned. Mitigating circumstances are not limited by the law; they may be unlimited in number, as long as they are based upon the evidence introduced by either the prosecution or the defense at the trial or sentencing.

Special Request No. 59: Mitigation-Definition:
A mitigating circumstance is not a justification or excuse for the offense. A mitigating circumstance is a fact about the offense, or about Leroy Hall, Jr., which in fairness, sympathy, compassion, or mercy may be considered in extenuating or reducing the degree of moral culpability, or which justifies a sentence of less than death, although it does not justify or excuse the offense.

Clearly, the instructions on statutory mitigating circumstances given the jury in this case directly relate, and encompass generally the specific subject matter that is contained within the defendant's special requests. For example, circumstance (j)(7),[17] the youth of the defendant at the time of the crime directly relates to special requests twenty-one and twenty-two. Circumstance (j)(2),[18] and circumstance (j)(8),[19]

---

[17]"The youth or advanced age of the defendant at the time of the crime."

[18]"The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance."

[19]"The capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment."

-35-

relate to all of the requested instructions. Finally, the general instructions given by the trial court broadly informed the jury of its unlimited ability to consider all types of factors by defining mitigating circumstance as

> any aspect of Leroy Hall, Jr.'s, character, background history, or physical condition or the nature and circumstances of the crime which in fairness or mercy, calls for a sentence less than death. . . . The law does not identify or limit what you can consider concerning Leroy Hall, Jr.'s character, background history, and physical condition or the nature and circumstances of the crime [as] mitigating."

Though neither the statutory mitigating factors charged, nor the general instruction on mitigating circumstances were as specific as the defendant's special requests, the instructions generally encompassed the subjects contained within the special requests and fairly conveyed to the jury its ability to consider a wide range of proof as mitigating circumstances. In addition, the trial court permitted the defendant to introduce substantial proof of nonstatutory mitigating circumstances. Moreover, during closing argument at the sentencing phase, the trial court allowed defense counsel broad latitude to argue nonstatutory mitigating circumstances to the jury. In fact, counsel made detailed arguments regarding virtually every point of the mitigation on which he sought to have instructions given to the jury.[20] Therefore, considering the instructions actually given the jury on mitigating circumstances, in conjunction with the broad latitude appropriately afforded the defendant to introduce evidence

---

[20]Defense counsel argued the following factors should be considered as mitigation. Hall expressed remorse; Hall was young when the offense was committed; Hall had a mental or emotional disturbance because of the failed relationship with the victim; Hall had a mental disease or defect; Hall was intoxicated; Hall was unusually immature for his age; Hall lacked normal emotional development; Hall is a follower and not a leader; Hall, at an early age, exhibited signs of mental or emotional disturbance that went untreated; At the time of the murder Hall's mental or emotional development was significantly below that of persons of his chronological age; Hall is an insecure man with low intelligence; Hall has low self-esteem and self-worth; Hall's basic personality inadequacy created stress and erosion of his self-confidence; Hall has a history of alcohol, drug and/or narcotic abuse and addiction; Hall expressed sorrow for the murder and was willing to plead guilty; Hall's capacity to appreciate the wrongfulness of his conduct was impaired.

–36–

and present argument about nonstatutory mitigating circumstances, we conclude that the trial court's refusal to charge the jury on nonstatutory mitigating circumstances does not constitute prejudicial error requiring a reversal. See Tenn. R. Crim. P. 52(a).

## COMPARATIVE PROPORTIONALITY REVIEW

The defendant next claims that his sentence is disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The defendant is asserting that his sentence is comparatively disproportionate because "[c]urrently there is no one under a death sentence in Tennessee who him- or herself murdered a girlfriend or spouse." The State responds that Hall is not the only person in Tennessee under a death sentence for the killing of a spouse or a girlfriend. We agree. See State v. Johnson, 743 S.W.2d 154 (Tenn. 1987); State v. Miller, 674 S.W.2d 279 (Tenn. 1984) and 771 S.W.2d 401 (Tenn. 1989); State v. Smith, 868 S.W.2d 561 (Tenn. 1993).

Our comparative proportionality review does not end with that finding, however. Recently, in State v. Bland, ___ S.W.2d ___ (Tenn. 1997), we analyzed in detail the precedent-seeking method this Court has employed over the past eighteen years in determining whether the death sentence imposed in a particular case is *disproportionate* to the sentence imposed in similar cases. In conducting comparative proportionality review, we begin with the presumption that the sentence of death is proportional to the crime of first degree murder. However, if a capital case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed, the sentence of death

-37-

in the case being reviewed is disproportionate. State v. Ramsey, 864 S.W.2d 320, 328 (Mo. banc 1993). Even if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which another defendant has received a life sentence, the death sentence is not disproportionate if this Court can discern some basis for the lesser sentence given in the similar case. See State v. Carter, 714 S.W.2d 241, 251 (Tenn. 1986). Moreover, where there is no discernable basis for the difference in sentencing, the death sentence is not necessarily disproportionate. This Court is not required to determine that a sentence less than death has never been imposed in a case with similar characteristics. To the contrary, our duty under the similarity standard is to assure that no aberrant death sentence is affirmed. Webb, 680 A.2d at 203. "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." Cf. Gregg v. Georgia, 428 U.S. 153, 203, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976).

As we had previously explained, and reaffirmed in Bland, comparative proportionality review is not a rigid, objective test. Id., __ S.W.2d at __; State v. Cazes, 875 S.W.2d 253, 270 (Tenn. 1994). We do not employ a mathematical formula or scientific grid, nor are we bound to consider only those cases in which exactly the same aggravating circumstances have been found by the jury. State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). After identifying a pool of similar cases, we consider a multitude of variables, some of which were listed in Bland, in light of the experienced judgment and intuition of the members of the Court. Bland, __

S.W.2d at ___. With respect to the circumstances of the offenses relevant factors enumerated in Bland include: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. With respect to comparing the character of the defendants, the following factors were listed in Bland as relevant: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation.

Considering the nature of the crime and the defendant, we conclude that imposition of the death penalty for the torturous and cruel premeditated killing of this young woman is not disproportionate to the penalty imposed in similar cases. Not only did Hall show a total disregard for human life, he exhibited complete indifference to human suffering. The twenty-two-year-old victim had cohabitated with the defendant since she was sixteen years old. In fact, it was her decision to end the relationship which proved fatal. For the three weeks following the separation and prior to her murder, the victim was consistently pursued by the defendant. He telephoned her residence at all hours of the day and night. He threatened her, stating at one point, "[i]f I can't have her, nobody can't." [sic] His mother described

him as a "basket case" when he was unable to see her. Attempting to gain control over her, the defendant decided to destroy her means of transportation. While in the process of accomplishing that objective, Hall decided that destroying her life would more effectively and efficiently accomplish his purpose of preventing her from seeking a life apart from him. He demonstrated uncommon cruelty by choosing to murder his ex-girlfriend by igniting her gasoline soaked body. Hall by his own admission never offered assistance to the victim. The pain and suffering which the victim endured in the hours preceding her death is unimaginable. She was alive, conscious, coherent, and alert as her tongue swelled to the extent that it protruded from her mouth and her eyelids became inverted. She experienced not only the initial pain of the burn injuries, but also the pain from the incisions that were part of the medical treatment for the burns. The only provocation or motive for this horrendous killing was the defendant's anger with the victim for leaving him and refusing to return. Following the murder, Hall did not turn himself into the authorities and report the crime. Instead, he went to his mother's house and attempted to hide the shirt he had been wearing. Fortunately, his step-sister witnessed his attempt and later reported the location of the shirt to the police. When Hall initially spoke with the police, he denied involvement in the murder. Later, he admitted his involvement, but denied that he killed the victim with premeditation and deliberation. In fact he attempted to plead guilty to felony murder in front of the jury. The jury disbelieved his testimony and found the existence of premeditation and deliberation. There is no evidence in this record to indicate that Hall had a prior criminal record; however, he admitted to abusing alcohol and drugs, and warrants had been issued for the defendant's arrest for the prior arson of the victim's car. With respect to his mental state, the evidence shows that he is a person prone to rage who has little self control. Though the

precise psychological diagnosis may vary, the defendant clearly displayed symptoms of both borderline personality disorder and antisocial personality disorder. He was not insane at the time this crime was committed. Though Hall was young at the time of the killing, only twenty-four years old, he is not, by any means, the youngest person on death row.[21] Moreover, contrary to his assertion, he is not the only person in Tennessee to receive a death penalty for the killing of a spouse or a girlfriend. Considering the nature of this crime and the character of this defendant, this murder places Hall into the class of defendants for whom the death penalty is an appropriate punishment. Based upon our review, we conclude that the following cases in which the death penalty has been imposed have many similarities with this case.

In State v. Johnson, 743 S.W.2d 154 (Tenn. 1987), the thirty-three year old defendant murdered his wife by forcing a large plastic garbage bag into her mouth which resulted in strangulation and asphyxiation. She bled from the nose and ears and traces of blood were found on a couch in the office where her death occurred. There was testimony that she would have been conscious during the terrifying ordeal and that from one to four minutes would have elapsed before she died. This Court stated that she suffered "a most terrible death," and declined to state all the "horrible details" of it. As in this case, the jury in Johnson found that the murder was "especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5)(1982). As in this case, the jury also found a second, but different, aggravating circumstance, that the defendant had been previously convicted of violent felony offenses, armed robbery and aggravated

---

[21]At least 44 of the persons sentenced to death in Tennessee since 1977 were between the ages of 19 and 25 when they committed the murder and at least ten were 18 or 19 when the offense was committed.

assault. Tenn. Code Ann. § 39-2-203(i)(2)(1982). The only possible motive for the unprovoked killing was the defendant's desire to prevent his wife, who had previously threatened to leave him, from learning that he had been found in a compromising position with a woman a few weeks before the murder. As did the relationship of the victim and Hall in this case, the relationship between Johnson and his wife had a history of difficulties. Though Johnson denied the murder and attempted to place blame for the killing upon a prisoner who was on work release, the jury disbelieved Johnson and sentenced him to death by electrocution.

In State v. Miller, 674 S.W.2d 279 (Tenn. 1984) and 771 S.W.2d 401 (Tenn. 1989), the twenty-four-year-old defendant was sentenced to death for murdering the twenty-three-year-old victim he had been dating. The victim had been born with brain damage and was mildly retarded. The defendant killed the victim by beating and repeatedly stabbing her. Some of the wounds were inflicted before death and some after death. Some of the stab wounds extended so deep into the bone that the forensics testimony indicated that a hammer had been used to drive the knife as if it were a nail. The victim had also been raped. As in this case, the issue of intoxication from drugs and alcohol and whether its degree was sufficient to negate premeditation was a contested issue in the trial. The jury rejected Miller's proof and found him guilty of premeditated murder. The jury imposed the death penalty upon finding that the murder "was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. 39-2-203(i)(5) (1982)(repealed). The sentence was reversed on direct appeal by this Court because irrelevant and prejudicial evidence was admitted at the sentencing phase. However, at the

resentencing hearing the jury again imposed the death penalty upon the basis of the (i)(5) aggravating circumstance and the sentence was affirmed upon appeal.

In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the forty-year-old defendant was found guilty of the triple premeditated murders of his estranged wife, age thirty-five and her two sons by a previous marriage, age sixteen and thirteen. The jury sentenced the defendant to death on the murder counts as to all three victims. With respect to the killing of his estranged wife, the jury found two aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5) (1982), and (2) the defendant committed "mass murder" which is defined as the murder of three or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan, Tenn. Code Ann. § 39-2-203(i)(12) (1982). Like the defendant in this case, Smith harassed his estranged wife in the weeks prior to the murder. In fact, at the time of the killing, warrants had been issued charging the defendant with aggravated assault of the victim. Smith killed his wife by shooting her in the left arm and the neck. The gunshot to her neck had severed her spinal cord, producing paralysis and death within two to six minutes. Though she would have been able to hear during some portion of this time, Smith's victim would have been unable to move. Therefore, she may have been able to hear the sounds of her children being murdered. After her death, the defendant slashed her neck and stabbed her with a knife and an awl. In mitigation, the defendant offered proof to show that he had been a good prisoner, and in addition, several of his co-workers testified that he was a good employee. His mother and daughter said that he had a severely retarded teenage son who

depended upon the defendant emotionally. As in this case, the defendant presented expert psychological proof that he had personality disorders.

In State v. O'Guinn, 709 S.W.2d 561 (Tenn. 1986), the thirty-two-year-old defendant was convicted of the rape and strangulation death of a seventeen-year-old woman. The defendant and the victim met at a nightclub in Jackson, Tennessee. Both were intoxicated from alcohol and drugs. They left the bar together and rode around in the defendant's car. At some point, the defendant became angry with the victim and assaulted and murdered her. The victim suffered a horrible ordeal. She had offensive and defensive wounds to her chest, arms, and head, indicating that she had been severely and brutally beaten. The cause of her death was ligature strangulation. She was choked to death with her halter top. A contusion with parallel bruises on either side of the nipple of her left breast might have been made by pliers or a similar object. A metal tire tool had been forcefully inserted into her vagina. Semen was also found in her vagina. Abrasions on her buttocks indicated that her body had been dragged across the ground. The injuries to her head, neck, breast, and vagina had occurred prior to her death. The jury convicted the defendant of first degree murder. At the sentencing hearing, the State introduced the photographs of the victim. The defendant's mother testified on her son's behalf and told how his father, from whom she had been divorced, had run the defendant from home when he was thirteen or fourteen years old. The defendant was divorced and had three children, and his former wife had engaged in an affair with his father. Upon finding one aggravating circumstance, that the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind, Tenn. Code Ann. § 39-2-203(i)(5) (1982), the jury sentenced the defendant to death by electrocution.

In <u>State v. Henley</u>, 774 S.W.2d 908 (Tenn. 1989), the jury imposed the death penalty after finding, as in this case, that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. Tenn. Code Ann. § 39-2-203(i)(5) (1982). Thirty-one-year-old Henley had been drinking and taking drugs on the day of the murder. He forced the victims, a married couple with whom he was acquainted, from the road to their house at gunpoint, demanding money. When the victims attempted to comply, Henley refused to take the money, and without provocation, shot the husband and then the wife. When the helpless, unresisting wife began moaning, Henley shot her two more times, poured gasoline on her body, and set the house on fire. Though the husband died from the gunshot wound, the wife died from burns and smoke inhalation.

As we have repeatedly emphasized, no two cases are identical, but the above cases have many similarities with Hall. In all five cases, the victims suffered particularly cruel and painful deaths. Though all murders are totally reprehensible, the means of death in this case was extremely heartless. In fact, it is difficult to conceive of a death more painful or torturous than that suffered by the victim in this case. In all of the cases, the defendants were acquainted with the victims, and in three of the five cases, like this case, the defendants received the death penalty for murdering their girlfriend or spouse. Like this case, in all of the five cases the victims remained conscious for some time after they were assaulted and experienced the pain from the injuries inflicted by the defendants. A motive for the murder in at least two of the cases was the defendant's desire to control his estranged wife. Likewise, one motive for the murder in this case was the defendant's desire to control the victim's life. In all five of the cases, the jury found that the murder was especially

heinous, atrocious, or cruel in that it involved torture or depravity of mind. Similarly, in this case, the jury found that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. Like Hall, many of the defendants relied upon their youth and mental disabilities as mitigation of the punishment. In at least one other case, the issue of premeditation and deliberation was strongly disputed, and in three of the five cases, the defendants claimed to have been intoxicated at the time of the murders. After reviewing the cases discussed above and many other cases not herein detailed, we are of the opinion that the penalty imposed by the jury in this case is not disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) (1991 Repl.), and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A) - (C) (1991 Repl. & 1996 Supp.). We have considered the defendant's assignments of error and determined that none require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Joseph M. Tipton, and joined in by Judge Gary R. Wade and Judge John H. Peay. Relevant portions of that opinion are published hereafter as an appendix. The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as

provided by law on the 22nd day of April, 1998, unless otherwise ordered by this

Court or other proper authorities.


_____
Frank F. Drowota, III,
Justice


**Concur:**
Anderson, C.J.,
Birch, Holder, JJ.

Reid, J. - separate concurring opinion

# Appendix
**(Excerpts from the Court of Criminal Appeals' Decision)**

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

DECEMBER SESSION, 1993

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | No. 03C01-9303-CR-00065 |
| | ) | |
| Appellee, | ) | Hamilton County |
| | ) | |
| v. | ) | Hon. Stephen M. Bevil, Judge |
| | ) | |
| LEROY HALL, JR., | ) | (First degree murder and aggravated arson) |
| | ) | |
| Appellant. | ) | |

<u>For the appellant</u>:

Karla G. Gothard
701 Cherry Street
Suite 300
Chattanooga, TN 37402
(At trial only)

William R. Heck
212 James Building
Chattanooga, TN 37402
(At trial and on appeal)

Brock Mehler
Capital Case Resource Center
704 18th Avenue South
Nashville, TN 37920
(On appeal only)

<u>For the appellee</u>:

Charles W. Burson
Attorney General of Tennessee
        and
Joel W. Perry
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN  37243-0493

William H. Cox
District Attorney General
        and
Thomas J. Evans
Assistant District Attorney General
600 Market Street, Suite 310
Chattanooga, TN 37402

OPINION FILED:   Dec 30 1996

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

## GUILT PHASE ISSUES

### I.

The defendant challenges the sufficiency of the convicting evidence relative to first degree murder and argues that there was no evidence that he acted with premeditation and deliberation. He asserts that the proof shows a crime committed by an emotionally and mentally disturbed man in the midst of a tumultuous personal relationship. The state responds that there was sufficient evidence of premeditation and deliberation.[22]

When the sufficiency of the evidence is challenged, the standard for review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 2789 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). A conviction that is approved by the trial court accredits the testimony which favors the state and resolves all conflicts in favor of the state's theory. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

---

[22] The defendant went to trial on three charges: (1) first degree murder by an unlawful, intentional, premeditated and deliberate killing, (2) first degree murder by a reckless killing committed during the perpetration of arson (felony murder), and (3) aggravated arson. However, he entered guilty pleas before the jury to arson and felony murder. After the trial court refused to "accept" the guilty pleas, the defendant persisted in such pleas before the jury, contesting only the charges that the killing was premeditated and deliberate. At the conclusion of the proof, the trial court instructed the jury that it could return a guilty verdict for either felony murder or for a premeditated and deliberated murder, but not for both. Under this instruction, the jury reported that the defendant was found guilty of aggravated arson and premeditated and deliberate murder. No finding regarding a felony murder was reported.

At the time of the offenses, T.C.A. § 39-13-202(a)(1) (1991) provided that the "intentional, premeditated and deliberate killing of another" is first degree murder.[23] A premeditated act is "one done after the exercise of reflection and judgment." T.C.A. § 39-13-201(b)(2) (1991). A deliberate act is "one performed with a cool purpose." T.C.A. § 39-13-201(b)(1) (1991). As is usually the case, a determination of culpable mental states, such as premeditation and deliberation, must be inferentially made from the circumstances surrounding the killing. Bass v. State, 191 Tenn. 259, 231 S.W.2d 707, 711 (1950); Taylor v. State, 506 S.W.2d 175, 178 (Tenn. Crim. App. 1973).

Our supreme court has discussed the then existing elements of first degree murder in State v. Brown, 836 S.W.2d 530 (Tenn. 1992) and State v. West, 844 S.W.2d 144 (Tenn. 1992). In Brown, the supreme court acknowledged that the Tennessee courts had often commingled the elements of premeditation and deliberation. The court relied upon the following historical definitions:

> "Premeditation" is the process simply of thinking about a proposed killing before engaging in the homicidal conduct; and "deliberation" is the process of carefully weighing such matters as the wisdom of going ahead with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if and when apprehended. "Deliberation" is present if the thinking, i.e., the "premeditation," is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a "careful weighing" of the proposed decision.

Brown, 836 S.W.2d at 540-41 (quoting C. Torcia, Wharton's Criminal Law §140 (14th ed. 1979) (emphasis in original)); see also State v. Gentry, 881 S.W.2d 1 (Tenn. Crim. App. 1993).

---

[23]  Although not relevant to our inquiry, we note that the definition of first degree murder contained in T.C.A. § 39-13-202 was amended in 1995. See T.C.A. § 39-13-202 (Supp. 1996).

Accordingly, premeditation requires evidence of a "previously formed design or intent to kill," and deliberation requires "some period of reflection, during which the mind is free from the influence of excitement or passion." West, 844 S.W.2d at 147. Moreover, to insure that the elements would be considered separately, the court in Brown deemed it prudent to abandon a commonly given instruction that premeditation could be "formed in an instant." Brown, 836 S.W.2d at 543. In this regard, our court, in Gentry, considered the nature of proof from which a jury might rationally infer the elements of first degree murder:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity;
>
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
>
> (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

881 S.W.2d at 4-5 (quoting 2 W. LaFave and A. Scott, Substantive Criminal Law, § 7.7 (1986) (emphasis in original).

We conclude that, in the light most favorable to the prosecution, the evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of a premeditated and deliberated first degree murder. There was evidence that the defendant and the victim had a troubled relationship and were in the midst of a separation. The defendant, according to one witness, had made threats toward the victim, including telling Chris Mathis to the effect that no one could have her if he could not. The defendant admitted

that, on the night of the killing, he was angry because he felt that the victim had lied to him.

The defendant's testimony included his procurement of materials used to commit the offense. He located a tea jug to fill with gasoline in order to burn the victim's car and he set out to find the victim. He related how he went to a gas station, filled the jug with gasoline, purchased a cigarette lighter and put paper towels in the opening of the jug. Also, the defendant's testimony clearly recounted his actions in searching for the victim. He went to the victim's place of employment and to her grandmother's house. He drove through the parking lots of numerous bars and nightclubs in his effort to find the victim. His testimony included the names of each establishment, the roads he traveled and his actions. Notwithstanding the defendant's testimony that he only intended to burn the victim's car, a rational trier of fact could infer planning activity from such evidence.

When finally locating the victim, he told her that he was going to burn her car, but he prevented her from leaving the scene or locking herself inside the car by taking her car keys. According to the defendant's own testimony, an argument ensued and he returned to his car to retrieve the gasoline jug. The defendant further admitted that he was aware the victim was lying prone on the front seat when he lit the gasoline jug and threw it into the car. The defendant fled the scene and later denied to police that he committed the offense.

We conclude that this evidence was sufficient for a rational trier of fact to find the elements of premeditation and deliberation beyond a reasonable doubt. The defendant's contentions that his actions were indicative of anger,

passion and an intent to burn the victim's car are unavailing. The jury heard the defendant's testimony in this regard and could rationally conclude that his actions were consistent with an intent to kill and deliberation. Moreover, although the defendant testified that he had been drinking on the night in question, he recounted his actions and whereabouts with clarity and detail.

The defendant attacks certain aspects of the state's proof that purportedly demonstrate the elements of premeditation and deliberation and offers other inferences that could have been drawn. For instance, he argues that the evidence regarding the extent of the victim's injuries did not by itself establish premeditation. See, e.g., Brown, 836 S.W.2d at 546. He contends that the opinion testimony relative to the "pouring" of gasoline on the victim was speculative and inadmissible, and, in any event, not probative of the elements of the offense. He contends that the inference that he broke the driver's side window of the victim's car before setting it ablaze conflicted with testimony that the driver's door was open and that, in any event, such evidence would indicate anger, not deliberation. The defendant further argues that evidence relative to his prior threats against the victim must be viewed in contrast to the evidence that he and the victim continued to have contact with one another after their separation. Finally, he argues that evidence that he procured the materials with which to make the bomb was not probative of premeditation, but rather could have been done in a state of passion. See, e.g., West, 844 S.W.2d at 148.

Essentially, the defendant's contentions require a reweighing of the evidence, something this court may not do. That is, it is of no consequence that alternative inferences might exist depending upon what view of the evidence is

-6-

made, because our review is limited to whether or not the jury's guilty verdict is rationally supported by the evidence when viewed in the light most favorable to the state. Under such a review, we conclude that the circumstances of the killing and the inferences that can be rationally drawn from the evidence by the jury are sufficient to sustain the first degree murder conviction. T.R.A.P. 13(e); Jackson v. Virginia, 443 U.S. at 318, 99 S. Ct. at 2789.

## II.

The defendant contends that the trial court erred in allowing evidence about the previous fires set to the victim's car on April 1, 1991 and April 6, 1991. He argues that said evidence was not relevant to a material trial issue and it was improperly used to prove that he committed the offenses on April 17, 1991. The state insists that the trial court's rulings with respect to evidence of the earlier fires were correct.

Testimony regarding fires to the victim's car on April 1st and April 6th 1991 was elicited through several witnesses. Gloria Mathis, the victim's grandmother, testified that the defendant had burned the victim's car twice before the offenses in question. The defendant objected based upon a lack of proof that the defendant committed either fire. The defendant requested that Ms. Mathis' statement be stricken from the record and that a curative instruction be issued or that the trial court grant a mistrial. The prosecution contended that the evidence of the earlier fires was intended to show the victim's state of mind and to show a "pattern of conduct by the defendant" through the similarity of the offenses.

The trial court ruled that it would allow testimony only about prior burnings that related to the defendant. The state assured the court that it would present a witness who would testify that the defendant had set the April 6th fire. The trial court overruled the defendant's objection relative to any evidence of prior fires "on the stipulation that if [the defendant's involvement is] disproven, [it would] sustain the motion for a mistrial." The trial court sustained the defendant's objection to Ms. Mathis' statement and instructed the jury to disregard the witness' statement that the car had been burned "twice before."

Ms. Mathis was then questioned about the April 6th fire but did not implicate the defendant as the person who had caused the fire. The trial court instructed the jury that Ms. Mathis' testimony relative to the April 6th fire was being admitted contingent upon it being made relevant at a later time. Her son, Chris Mathis, was later permitted to relate facts regarding the April 6th incident. In fact, it was Chris Mathis, an eyewitness, who connected the defendant to the April 6th fire. The defense, who had earlier noted an "ongoing objection," did not contemporaneously object to Chris Mathis' testimony.

Before the testimony of Viola Wylene Price, the prosecution advised the court that Price and Commander Earl Atchley of the Chattanooga Fire Department would relate statements made by the victim on the scene to the effect that the defendant had burned her car on two previous occasions. The prosecutor argued that the evidence was relevant to the victim's state of mind, insofar as she knew the defendant's prior acts and therefore would not have associated with him voluntarily. The defense again noted that such evidence of prior acts would lead

the jury to conclude that the defendant had committed the acts for which he was being tried.

The trial court ruled that the victim's statements were admissible as "excited utterances." See Tenn. R. Evid. 803(2). The court further ruled that it would instruct the jury that the statements were admitted to show the victim's existing state of mind but not "as to whether there were in fact two prior fires or whether there weren't two prior fires."

Price was allowed to testify that the victim told her that the defendant had tried to set fire "to her twice before." Likewise, Atchley testified that the victim said that the defendant had committed the offense and that he was the "same guy that set the automobile on fire on the 6th." The trial court, on each occasion, instructed the jury that the statements were "excited utterances," and not offered to prove the defendant committed the prior fires.

Ed Forester and Mike Donnelly testified relative to the prior fires in the course of their testimony about their investigations. Before Forester's testimony, the prosecution informed the trial court that the witness would relate his findings with regard to his April 1st and April 6th investigations. The state argued that the evidence was relevant to show the victim's state of mind with regard to her relationship with the defendant and to rebut the defendant's theory that the victim was with the defendant willingly on the night of her death. The defense objected on the grounds that Forester's statement that the victim suspected the defendant of the April 1st fire had nothing to do with her state of mind and that there had been no evidence connecting the defendant to the April 1st fire. The trial court sustained the defendant's objection relative to evidence of the April 1st fire, stating

that it was too remote and that the victim's mere suspicion of the defendant for the April 1st fire was not enough to allow its introduction. The trial court also ruled that Forester could testify to the April 6th fire because there had been proof of the defendant's involvement. The court further noted that evidence of the April 6th fire had been admitted because "it was relevant and probative to the issue of premeditation and intent of the defendant when he . . . set the fire on April the 17th, . . . since there was proof that he himself actually set the fire."

Forester then testified that he had met the victim on April 1, 1991, and that he had investigated a fire to the victim's car on April 6, 1991. He related the details of the April 6th fire. At one point in this testimony, he refers to "both previous fires." The defendant later objected out of the presence of the jury but stated no basis for the objection. The trial court stated that it did not hear the reference to more than one previous fire and never ruled on the defendant's objection.                       .

Donnelly testified that the investigation of the victim's car revealed evidence of "three separate and distinct fires." He added that he learned fires had been set to the car on April 1st and April 6th, in addition to the day of the offenses being tried. The defense objected to his testimony and moved for a mistrial on the basis of the cumulative references that had been made to the earlier fires. The trial court denied the mistrial motion because it did not think that the defendant had suffered any prejudice. However, the trial court offered a curative instruction for the jury to disregard the reference to the April 1st fire, but the defendant declined the instruction.

-10-

As the defendant correctly notes, evidence that an accused has committed some other crime or bad act independent of that for which he is charged is generally inadmissible, even though it may be a crime or act of the same character as that on trial. Tenn. R. Evid. 404(b); State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). However, if evidence that a defendant has committed a crime separate and apart from the one on trial is relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted. Tenn. R. Evid. 404(b); Howell, 868 S.W.2d at 254. Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent or the rebuttal of accident or mistake defenses. In State v. Parton, 694 S.W.2d 299, 301 (Tenn. 1985), the supreme court stated that admissibility was also contingent upon the trial court finding clear and convincing evidence that the prior crime, wrong or act was committed by the defendant. See, e.g., State v. Holman, 611 S.W.2d 411, 412-13 (Tenn. 1981).

As our previous recital of the facts indicates, the record does not provide a pattern of clear cut testimony, objections and rulings regarding the previous fires. Sometimes the defendant objected without specifying the basis of the objections, one time he claimed a continuing objection, while other times there was no specific objection made. The trial court's rulings were, similarly, often not specific. In this respect, we note that at no time did either of the parties refer to Rule 404(b) or request a jury-out hearing as provided by Rule 404(b) at which specific rulings upon each questioned proffer of evidence could be made. See, e.g., State v. Bigbee, 885 S.W.2d 797, 806 (Tenn. 1994). As the rule indicates,

-11-

the trial court was not obligated to conduct such a hearing absent a request. In any event, the ultimate result is that there is no record of a trial court analysis and determination regarding issue relevance and potential prejudice.

Nevertheless, as the state contends, the record indicates that the evidence of the previous fires is relevant to the defendant's motive and intent regarding his conduct for which he is now being tried. In this respect, we note that the trial court stated at one point that the April 6th fire was relevant to intent and premeditation. We agree. In State v. Smith, 868 S.W.2d 561 (Tenn. 1993), the defendant objected to the introduction of evidence that he committed previous assaults against his estranged wife, one of the murder victims. The defendant claimed that the evidence violated Rule 404(b). The supreme court stated:

> In response to the Defendant's assertions that the evidence of the two episodes was irrelevant and inadmissible under Tenn. R. Evid. 404(b), the State cites a line of cases, see, e.g., State v. Turnbill, 640 S.W.2d 40, 46-7 (Tenn. Crim. App. 1982); and State v. Glebock, 616 S.W.2d 897, 905-906 (Tenn. Crim. App. 1981), which hold that violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim. Also, in the present case, the victims, despite the Defendant's threats to kill them if they did so, had filed charges against the Defendant based on these prior assaults. The evidence of these violent episodes was admitted not to prove the Defendant acted in accord with his character but as part of the proof establishing his motive for the killings. The probative value of this evidence is not outweighed by the danger of unfair prejudice.

Smith at 574 (emphasis added) (citations omitted). We believe the facts in the present case are similar to those in Smith. The defendant committed prior acts of arson toward the victim and charges were brought. The defendant was aware of the charges. As in Smith, these facts were highly probative of the defendant's

-12-

motive and intent. We conclude that the probative value of the evidence is not outweighed by the danger of unfair prejudice and was, therefore, admissible.

### III.

The defendant argues that the trial court erred by admitting a photograph taken of the victim at an autopsy. He argues that the victim's appearance in the photograph had been altered by medical procedures and that the prosecution's expert witness, as well as lay witnesses, were able to describe the victim's condition without the use of photographs. The state contends that the photograph was relevant to show the nature of the victim's injuries and that the trial court did not abuse its discretion in this regard.

The record indicates that the prosecution sought to introduce a series of four photographs, contending that they accurately depicted the consistency of the burns received by the victim. Dr. Merriman testified that the photographs would best illustrate her testimony, although she conceded that she could describe the victim's condition, including her charred, hardened and discolored skin, without them. Dr. Merriman also admitted that the photographs, taken at the autopsy, did not reflect the victim's condition at the time of her admittance to the hospital. In this regard, she acknowledged that incisions had been made in the victim's skin and that fluids provided to the victim produced a swelling to her body, eyes, lips and tongue.

Nonetheless, the trial court ruled that one of the photographs, which depicted the victim's back as she lay on her side, was admissible, stating that it was representative of all the burns and was relevant to assist the jury in

understanding the seriousness and degree of the burns. The trial court ruled that the other photographs, which more graphically depicted the victim's head, torso, face and extremities, were inadmissible because their probative value was outweighed by the danger of unfair prejudice.

The leading case regarding the admissibility of photographs of murder victims is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which the supreme court indicated that the determination of admissibility is within the discretion of the trial court after considering the relevance, probative value and potential unfair prejudicial effect of such evidence. The general rule, as stated in Banks, is that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-951 (citing People v. Jenko, 410 Ill. 478, 102 N.E.2d 783 (1951)). On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Banks, 564 S.W.2d at 951 (citing Milam v. Commonwealth, 275 S.W.2d 921 (Ky. 1955)).

Thus, even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Banks, 564 S.W.2d at 951; see also Tenn. R. Evid. 403. In Banks, the court stated that "[t]he more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." 564 S.W.2d at 951 (citation omitted). Also, it noted that autopsy

-14-

photographs are often condemned "because they present an even more horrifying sight and show the body in an altered condition. . . ." Id.[24]

In the present case, the admitted photograph did depict the victim in a different condition due to the treatment procedures that had been administered. This factor weighs against admissibility. Banks, 564 S.W.2d at 951. Likewise, the testimony of Dr. Merriman and several lay witnesses conveyed the graphic and extensive nature of the victim's burns and the extent of her injuries, further weighing against the admission of the photograph. Id. On the other hand, the trial court found that the photograph was relevant to "the seriousness and the degree of the burns." The trial court ruled that the photograph showed the nature of the injury and the consistency of the burns received by the victim. This, in turn, was relevant to an assessment of how the offense was committed by the defendant. We note that part of the prosecution's theory, as related by Dr. Merriman and Mike Donnelly, was that the victim's injuries were consistent with a dousing of flammable material, and not just a splashing or splattering. In this regard, the evidence was relevant to the manner in which the offense occurred and to clarify testimony on the issue. See, e.g., Banks, 564 S.W.2d at 951. See also Smith, 868 S.W.2d at 576 (trial court did not abuse its discretion in allowing autopsy photograph of victim during guilt phase in part to illustrate testimony); State v. Caughron, 855 S.W.2d 526, 536 (Tenn. 1993).

---

[24] The defendant relies upon State v. McGall, 698 S.W.2d 643 (Tenn. Crim. App. 1985), in which the victim had been shot in the chest and later run over and dragged by a car. This court held that it was error to admit photographs of the victim because, with the exception of the gunshot wound, all of the harm to the victim was caused by the subsequent passing of a vehicle. Conversely, in the present case, the photograph that was admitted, although altered, was limited in nature and depicted injuries the victim received as a result of the defendant's conduct. Thus, we do not consider McGall to be dispositive of this issue.

The trial court excluded several other photographs that were more graphic in nature on the ground that their probative value was substantially outweighed by the risk of prejudice to the defendant. By contrast, the photograph that was admitted was more limited in nature, revealing the victim's back as she lay on her side. Given the trial court's full consideration of this issue, as evidenced by its admission of one photograph and exclusion of several others, we conclude that the trial court did not abuse its discretion in this regard. Banks, 564 S.W.2d at 951. See also Smith, 868 S.W.2d at 576; State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); Caughron, 855 S.W.2d at 536; Cazes, 875 S.W.2d 253, 263 (Tenn. 1994). It was not error for the trial court to admit this photograph.

## IV.

The defendant contends that the trial court erred in allowing "misleading and speculative" opinion testimony about how gasoline was used in the homicide. In essence, Mike Donnelly, a Tennessee Fire Marshall arson investigator, gave his opinion that the gasoline had been "poured rather than thrown" onto the victim. The defendant contends that Donnelly's testimony does not meet the four-part test for admission of scientific expert testimony provided in State v. Williams, 657 S.W.2d 405, 412 (Tenn. 1983). In Williams, our supreme court recognized the following requirements for expert testimony: (1) the witness must be an expert, (2) the subject matter of the witness' testimony must be proper, (3) the subject matter must conform to a generally accepted explanatory theory, and (4) the probative value of the witness' testimony must outweigh its prejudicial effect. Id. at 412. In fact, the defendant now claims that Donnelly's testimony met none of these factors.

-16-

Unfortunately, the defendant's objections at trial were not so plainly stated. Donnelly testified in detail to substantial training and experience relative to fire and explosion investigations. Without objection, the trial court accepted him as an expert witness in the field of arson investigation. Donnelly testified that he believed that the fire had been started on the driver's side of the car, both front and rear seat areas. He indicated that these areas had suffered the greatest amount of damage and were where the greatest amount of combustibles had been consumed. Donnelly said that gasoline had been applied to the driver's side of the car as an accelerant. He also testified that based on his examination of the car and his viewing of the photographs of the victim's burns, he believed that the gasoline had been poured directly onto the victim. He said that his belief was based upon the fact that damage was limited to the interior of the car, being confined to the driver's side of the car, both front and rear. Likewise, he relied upon the fact that both the front and back of the victim's body was burned, an indication that accelerant was not just splashed onto her while she was in the car.

During the course of this testimony, the defendant's objection primarily related to the fact that Donnelly was not a doctor, in terms of his attempting to interpret how an accelerant was applied to the victim's body. The trial court concluded that Donnelly was entitled to give his opinion based upon his expertise, his review of the autopsy photographs, the lab and investigative reports, and his personal inspection of the materials and car. In this respect, the trial court's ruling was within its discretion and was appropriate. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

The more specific attacks upon Donnelly's testimony that the defendant now raises under Williams cannot be pursued because they were not previously raised. Obviously, if any question had been raised in the trial court about the reliability of the scientific principles involving fire accelerants and paths of burning, full explanation may have been forthcoming from Donnelly or other experts. Without proper objection, we will not fault the trial court or the state for not presenting a greater foundation for the opinions Donnelly gave. Otherwise, we note that expert testimony regarding the nature of accelerants or the paths that fires take is not uncommon. See, e.g., Otis v. Cambridge Mutual Fire Insurance Company, 850 S.W.2d 439, 443-444 (Tenn. 1992). In this respect, given the record of Donnelly's expertise, the items he reviewed, and the nature of the conclusions he reached, we are unable to hold that his testimony was improperly speculative or otherwise inadmissible.

**V.**

The defendant claims that the trial court gave incorrect instructions to the jury on the first degree murder elements of premeditation and deliberation. As we noted, our supreme court has held that an instruction to the jury that premeditation may be formed "in an instant" should be abandoned. Brown, 836 S.W. 2d at 546. The court concluded that such an instruction improperly blurs the distinction between premeditation and deliberation and does not properly allow the jury to consider whether a defendant's actions were done with reflection and a cool purpose. Id. See also West, 844 S.W.2d at 147.

In the present case the trial court properly instructed the jury on the separate elements of intent, premeditation, and deliberation.  However, the instructions also charged that:

> Premeditation means that the intent to kill must have been formed prior to the act itself.  Such intent to kill may be conceived and deliberately formed in an instant.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time.  It is sufficient that it preceded the act, however short the interval, as long as it was the result of reflection and judgment.

The instruction contained the language the court in Brown held should be abandoned.  The defendant did not object to the instruction at trial in March of 1992 nor did he raise the erroneous instruction as an issue in his initial motion for a new trial.  Brown was decided in June 1992 and the defendant included the issue in his amended motion for a new trial filed in August 1992.  In denying relief on this ground during the motion for a new trial hearing, the trial court noted that Brown was not to be applied retroactively and that, in any event, there was sufficient evidence of premeditation and deliberation in this case to render any error harmless.  The state on appeal argues these identical grounds and claims that the issue is without merit.  We agree.

In State v. Meadows, 849 S.W.2d 748, 754 (Tenn. 1993), our supreme court reaffirmed its position regarding retroactivity when it stated that "newly announced state constitutional rules will be given retroactive application to cases which are still in the trial or appellate process at the time such rules are announced, unless some compelling reason exists for not so doing."  The first step in determining whether a case will be given retroactive application is whether it announces a new constitutional rule.  "[A] case announces a new constitutional rule when it breaks new ground or imposes a new obligation on the States or the

-19-

Federal Government." Teague v. Lane, 489 U.S. 288, 301, 109 S. Ct. 1060, 1970 (1989).

This court has held on numerous occasions that the Brown decision did not create a new constitutional rule. See, eg., State v. Lofton, 898 S.W.2d 246 (Tenn. Crim. App. 1994), app. denied, (Tenn. Feb. 27, 1995); State v. Jimmy Sills, No. 03C01-9410-CR-00370, Hamilton Co. (Tenn. Crim. App. May 10, 1995), app. denied, (Tenn. Sept. 11, 1995); State v. Joe Nathan Person, No. 02C01-9205-CC-00106, Madison Co. (Tenn. Crim. App. Sept. 29, 1993); State v. Willie Bacon, Jr., No. 1164, Hamilton Co. (Tenn. Crim. App. Aug. 4, 1992), app. denied. Also, as stated in Lofton, the supreme court did not hold in Brown that the instruction on premeditation violated a constitutional right. Lofton, 898 S.W.2d at 249-250. It only stated that it would be prudent to abandon the instruction because of the potential for confusion. Id. We conclude that the trial court did not err in its instructions relative to the elements of premeditated and deliberated first degree murder.

**SENTENCING PHASE**

**I.**

The defendant argues that the trial court erred by requiring the defense to disclose a report that had been prepared by his court-appointed investigator, Colin Mitchell, through the testimony of Dr. Meyer. The defendant argues that the report was attorney work product and was privileged. He argues that he was prejudiced by the disclosure because the prosecution was then permitted to cross-examine Dr. Meyer regarding numerous acts committed by the defendant as a child, and then argue these acts to the jury during summation.

-20-

The state concedes that the report was undiscoverable work product under Rule 16(b)(2), Tenn. R. Crim. P.,[25] but argues that because the defendant allowed Dr. Meyer to review the report before testifying, the report is discoverable as a basis of his evaluation. They also argue that the specific instances of conduct were properly admitted as an impeachment of Dr. Meyer's evaluation that the defendant exhibited various character traits consistent with both a borderline personality disorder and a post-traumatic stress disorder by showing, instead, that the defendant also exhibited several character traits of an antisocial personality disorder. We agree.

Rule 703, Tenn. R. Evid., provides that an expert may base his or her opinion on facts or data "perceived by or made known to the expert at or before the hearing." Furthermore, Rule 705, Tenn. R. Evid., provides that the court may require disclosure of the underlying facts or data relied upon by the expert in formulating his opinion. Dr. Meyer testified that he completed his evaluation and report of the defendant in December 1991. On cross-examination, he testified that he relied upon the defendant's statements and the investigator's report to develop facts surrounding the defendant's background. In a jury-out hearing, Dr. Meyer testified that he received the investigator's report about one week prior to trial, used it to verify various aspects of the defendant's childhood and educational background, and considered it before testifying at trial. When cross-examination resumed, Dr. Meyer admitted that he altered his opinion of the defendant's evaluation somewhat after reviewing the investigator's report relative

[25] In State v. Nichols, 877 S.W.2d 722, 730 (Tenn. 1994), the supreme court concluded that "when a psychologist or psychiatrist does not prepare a summary report, but instead relies on extensive memoranda to record not only observations and hypotheses but also evaluations, such records are discoverable under Rule 16(b)(1)(B)." In this case, Dr. Meyer prepared an evaluation report in advance of trial and therefore, the investigator's report is considered an internal memorandum and is generally nondiscoverable, as the state concedes, under Tenn. R. Crim. P. Rule 16(b)(2).

to the defendant's childhood background and behavior. Thus, information in the investigator's report helped form a basis for Dr. Meyer's opinions and it was then subject to disclosure to the state.

Relative to the defendant's claim that he was prejudiced by the cross-examination of Dr. Meyer about several instances of the defendant's setting fire to things as a child, the state argues that the specific instances of conduct were used as a basis to impeach Dr. Meyer's evaluation and to show that the defendant exhibited character traits associated with an antisocial personality disorder. As discussed earlier, Rule 404(b), Tenn. R. Evid., deals with the admission of prior bad acts of the defendant. A jury-out hearing was held in which the trial court ruled that specific instances of conduct could be discussed relative to the reliability of Dr. Meyer's diagnosis. We conclude that the prior bad acts contained in the investigator's report upon which Dr. Meyer, in part, based his evaluation of the defendant were admissible to impeach the doctor's diagnosis and that the danger of their prejudicial effect did not outweigh their probative value.

## II.

The defendant contends that the trial court erred with regard to its instructions to the jury on the mitigating circumstances in T.C.A. § 39-13-204(j)(2) and (j)(8). The T.C.A. § 39-13-204(j)(2) circumstance is that the "murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." The T.C.A. § 39-13-204(j)(8) circumstance is that the "capacity of the defendant to appreciate the wrongfulness of [his] conduct or to conform [his] conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to

-22-

establish a defense to the crime but which substantially affected the defendant's judgment." The defendant contends that the use of "extreme" in the former provision and "substantially" in the latter, deprived the jury of potential mitigation evidence that falls short of these standards.

The defendant's argument was rejected by our supreme court in addressing the identically worded provisions under the previous death penalty statute. State v. Smith, 857 S.W.2d 1, 16-17 (Tenn. 1993). See also T.C.A. § 39-2-203(j)(2) and (j)(8). The defendant in Smith argued that "the use of the modifier in (j)(2) and (j)(8), misled the jury in its consideration of evidence of his mental and emotional impairments and intoxication at the time of the offense." The supreme court, however, concluded that there was no likelihood of the jury being misled by these provisions. Smith, 857 S.W.2d at 17.

Also, the defendant's contention that the jury is not provided a basis upon which to consider mitigating evidence that falls short of being "extreme" or "substantial" is unavailing. As the state notes, the jury was instructed on T.C.A. § 39-13-204(j)(9), which provides that the jury may consider "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearings." (Emphasis added). We note as well that a considerable portion of the defense argument to the jury related to the various aspects of the defendant's mental and emotional states, from his youth to the time of trial. Thus, the qualifiers in the statutory provisions in question did not unconstitutionally limit the jury's consideration of mitigating evidence.

Cazes, 875 S.W.2d at 268. We conclude that the defendant is not entitled to relief on this issue.[26]

## III.

As a corollary to the preceding issue, the defendant argues that the trial court erred in refusing to allow certain evidence that the defense claimed was mitigating in nature. We note, of course, that under the Eighth and Fourteenth Amendments to the United States Constitution, a capital sentencer must not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any circumstances of the offense offered by the defendant as a basis for a sentence less than death. Skipper, 476 U.S. at 8, 106 S. Ct. at 1671; Lockett, 438 U.S. at 604, 98 S. Ct. at 2964. In addition, T.C.A. § 39-13-204(c) provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; and evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. . . .

---

[26] We note that the defendant also relies on Smith v. McCormick, 914 F.2d 1153, 163-65 (9th Cir. 1990), which we conclude is distinguishable. The Ninth Circuit reversed the denial of habeas corpus relief in part because Montana's death penalty structure interfered with the consideration of mitigating evidence. The defendant is correct that Montana statutes contained similar mitigation factors modified by "extreme" and "substantial." However, Montana statutes also provided that the death penalty was required if the sentencer found one or more aggravating circumstance and no mitigating circumstances "sufficiently substantial" to call for leniency. Id. at 1163. Tennessee provisions do not contain such a limitation. See T.C.A. § 39-13-204(f) and (g).

(emphasis added).  The trial court therefore maintains its authority to determine the admissibility of evidence offered in the sentencing phase and to exclude any evidence not relevant to the above factors.  See, e.g., Smith, 857 S.W.2d at 17; State v. Johnson, 632 S.W.2d 542, 548 (Tenn. 1982); see also Lockett, 438 U.S. at 604, 98 S. Ct. at 2964, n.12.

In determining the effect of an error excluding relevant mitigating evidence, we look to the standard set forth in Skipper.  There, the United States Supreme Court held that an error in excluding evidence is not harmless if the exclusion of the evidence "may have affected the jury's decision to impose the death sentence."  Id. at 8, 106 S. Ct. at 1673.  In Skipper, the trial court had excluded the testimony offered relative to the defendant's good behavior and adjustments since his incarceration for the offense.  The Supreme Court concluded that the "exclusion by the state trial court of relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender."  Id.

In the present case, the defendant sought to elicit testimony from the defendant's mother relative to the nature of the defendant's relationship with the victim.  The witness related that the couple was very happy for the first few years of their relationship but started having problems the past two years.  The couple separated and reconciled several times.  The trial court sustained an objection as to what the victim told the witness about the relationship in November 1990; however, the defendant made no proffer of evidence in this regard.  See Tenn. R. Evid. 103.  We, therefore, cannot conclude that the ruling was improper.  See Tenn. R. Evid. 103(a)(2).

-25-

The defendant further elicited from the defendant's mother statements made by the defendant regarding his feelings toward the victim. The prosecution objected because the defense had not specified a time period with regard to the question. The trial court overruled the objection, but limited the defense to questions "within the approximate period of time when the murder took place." The witness was then permitted to testify as to the nature of the relationship from December 1990 to the time of the offense. Again, the defense made no proffer of any additional testimony it sought to admit. The nature of the relationship between the victim and the defendant, insofar as it was a troubled one and had a potential effect on the defendant's mental state, was clearly conveyed to the jury through the testimony of this witness and others. We cannot conclude that the trial court erroneously excluded additional mitigating evidence in this regard. See, e.g., Smith, 857 S.W.2d at 17-18.

The defendant also claims that the trial court should have allowed admission of certain photographs as mitigating evidence. The photographs included one of the defendant at thirteen years of age, and several of the victim. The defendant argued that the jury should consider the photos because they depicted how he looked at his mental age of thirteen, and how, according to the defense, the victim "really did look in reality" and not how the state had "represented her to be." The trial court ruled that the photographs were not relevant to any factors in mitigation and excluded them on that basis.

The testimony of Dr. Meyer established clearly his opinion relative to the defendant's emotional and intellectual levels, as well as his mental age. Introduction of the defendant's photo in this regard would arguably have been

-26-

cumulative. Thus, exclusion of the defendant's photograph, we conclude, did not affect the jury's decision to impose the death penalty. See, Skipper, 476 U.S. at 8, 106 S. Ct. at 1669. The defendant's claim with regard to the victim's photographs are also without merit. First, he failed to show how such evidence, purporting to show what the victim "really" looked like, would have been relevant in mitigation. T.C.A. § 39-13-204(c). Second, we cannot, on this record, conclude that the exclusion of such photographs affected the jury's decision to impose the death penalty. Accordingly, the trial court did not abuse its discretion in excluding this evidence. See Smith, 857 S.W.2d at 17-18.

Finally, the defendant argues that the jury should have been allowed to consider the medical histories of the victim's past abortions as mitigation evidence. In ruling on this issue, the trial court said:

> There's proof before this jury, the defendant testified about [the victim] having an abortion, that it was weighing on his mind, and that . . . he was concerned about the fact that she might be pregnant and have another abortion. That testimony was introduced without objection from the state and it is before this jury. Whether he was or was not suffering under the fact that she had had abortions . . . is a question the jury will have to decide . . . . It's something that the jury can consider as a mitigating factor.

Thus, the trial court allowed evidence that the victim had abortions in the past. The prosecution objected to admitting the entire records of the procedures and the trial court sustained the objection:

> There are some pages that I don't think are relevant, and I don't think it's necessary for the jury to . . . know the exact procedure used. The gross description I don't think is necessary to prove at this point what the defense is trying to prove in this case, which is the fact that the defendant knew that she'd had an abortion.

On appeal the defendant has advanced no basis upon which to hold that the trial court's ruling in this regard was an abuse of discretion. The trial court's ruling that the particulars of the abortion procedures were not relevant mitigating factors is supported by the record. See T.C.A. § 39-13-204(c). The evidence in the record, in particular the defendant's testimony in the guilt phase, reveals that the fact of the victim's abortions may have affected the defendant's mental state, but not the particulars of such procedures. Accordingly, the defendant is not entitled to relief on the ground that the trial court unconstitutionally deprived the jury of mitigating circumstances. See Smith, 857 S.W.2d at 17-18.

## IV.

The defendant's final issue consists of numerous constitutional attacks against the Tennessee Death Penalty statute, T.C.A. §§ 39-13-204 and -206, under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 8, 9, 16, and 17 of the Tennessee Constitution; and Article II, Section 2 of the Tennessee Constitution. His contentions, generally, are: (A) that the statute fails to narrow in a meaningful manner the class of death eligible defendants, (B) that the death sentence in Tennessee is imposed arbitrarily and capriciously, (C) that death by electrocution is cruel and unusual punishment, and (D) that the manner of conducting a proportionality review of death sentences in Tennessee is constitutionally inadequate.

### (a)

The defendant argues that the death penalty provisions fail to narrow in a meaningful manner the class of death eligible defendants in Tennessee. He asserts three arguments in support of this position. First, he contends that the

aggravating circumstance in T.C.A. § 39-13-204(i)(6), that the murder was committed "for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," duplicates the felony murder aggravating factor in T.C.A. § 39-13-204(i)(7) (1991). His claim is without merit. Although the state attempted to prove factor (6) in this case, and the jury was so instructed, the jury rejected it. Moreover, the jury's finding of factor (7) has been held to be proper for a conviction of premeditated first degree murder. See Middlebrooks, 840 S.W.2d at 346.

Second, the defendant contends that the aggravating circumstance in T.C.A. § 39-13-204(i)(5), that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death," is unconstitutionally vague and overbroad. Our supreme court rejected similar contentions, however, in analyzing the former version of this factor, T.C.A. § 39-2-203(i)(5), which read: "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." See State v. Black, 815 S.W.2d 166, 181-82 (Tenn. 1991); State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988); State v. Williams, 690 S.W.2d 517, 526-30 (Tenn. 1985). Likewise, this court has rejected this contention with respect to its current version. State v. Richard Odom, a/k/a Otis Smith, No. 02C01-9305-CR-00080, Shelby Co., slip op. at 35 (Tenn. Crim. App. Oct. 19, 1994), app. granted on other grounds (Tenn. Feb. 6, 1995).

Third, the defendant contends that the aggravating factors in T.C.A. § 39-13-204(i)(2), (i)(5), (i)(6), and (i)(7) fail to narrow the class of death eligible defendants because they combine to encompass the majority of the homicides in this jurisdiction. There is nothing in the record to support the defendant's argument. Moreover, (i)(2) and (i)(6) do not pertain to this case. Factor (i)(2) was

not relied upon by the state and factor (i)(6) was rejected by the jury. Thus the claim with respect to these factors is without merit. See, e.g., State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994); State v. Cauthern, 778 S.W.2d 39, 47 (Tenn. 1989).

**(b)**

The defendant argues that the death penalty in Tennessee is imposed capriciously and arbitrarily.[27] He asserts ten arguments in support of this contention. First, he complains that the prosecutors in this state have unlimited discretion as to whether to seek the death penalty in a given case. Second, the defendant argues that the prosecutor's unfettered discretion to subject any defendant charged with first degree murder to a capital sentencing hearing constitutes an improper delegation of judicial power and of legislative power in violation of Article II, Section 2 of the Tennessee Constitution. Third, he argues that such discretion violates state and federal guarantees of equal protection and results in the wanton and freakish imposition of the death penalty that was condemned in Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726 (1972). Fourth, the defendant argues that the failure to create a uniform system of jury selection results in unequal treatment for capital defendants that necessarily results in the arbitrary and capricious imposition of the death penalty. Fifth, he argues that the manner of selecting "death qualified" jurors results in juries that are prone to conviction. Sixth, the defendant argues that capital defendants should be allowed to address jurors' popular "misconceptions" regarding parole eligibility, the cost of incarceration versus the cost of execution, general deterrence and the method of execution. Seventh, he argues that it is constitutional error to instruct juries that they must agree unanimously in order to impose a life sentence without telling

---

[27] In support of his contentions, the defendant cites to numerous studies, newspaper articles, law review articles, and journals. There is no evidence in the record, however, with respect to any of his contentions. See, e.g., Smith, 857 S.W.2d at 23.

juries the effect of a nonunanimous verdict.  Eighth, he argues that the Tennessee

Pattern Jury Instructions create a reasonable likelihood that jurors believe that

they must unanimously agree on the existence of any mitigating factors.  Ninth,

the defendant argues that the Tennessee death penalty statute fails to require that

the jury make the ultimate determination of whether death is appropriate in a

specific case.  And tenth, the defendant submits that it is constitutional error to

deny the defendant the right to give final closing argument in the penalty phase of

a capital trial based upon his contention that once an aggravating circumstance is

proven, the burden of proof shifts to the defendant to present mitigating evidence.


Relative to the defendant's first argument that prosecutors have

unlimited discretion as to whether to seek the death penalty in a given case, our

supreme court has held that opportunities for discretionary action that inhere in

the processing of a murder case, including the authority of the prosecutor to select

those persons whom he or she wishes to prosecute for a capital offense, do "not

render the death penalty unconstitutional on the theory that the opportunities for

discretionary action render imposition of the death penalty freakish or arbitrary."

Brimmer, 876 S.W.2d at 86 (quoting Gregg v. Georgia, 428 U.S. 153, 96 S. Ct.

2909, 2937 (1976)).  See also Cooper v. State, 847 S.W.2d 521, 536-38 (Tenn.

Crim. App. 1992) (rejecting similar claim in post-conviction context).  This issue is

without merit.


Second, the defendant argues that the discretion accorded the

prosecution is an improper delegation of legislative and judicial power in violation

of Article II, Section 2 of the Tennessee Constitution.  The defendant makes

reference to costs and expenditures that result from a prosecutor's decision to

seek the death penalty and argues that such appropriations must be made by the

legislature.  He does not, however, offer support for his contention in the record.

The state does not address this issue in its brief.

In State v. Brackett, 869 S.W.2d 936 (Tenn. Crim. App. 1993), the defendant argued that Tenn. R. Crim. P. 5(a), which allows the prosecution to object to the defendant's waiver of a grand jury investigation and jury trial so as to submit to the jurisdiction of the general sessions court, violated Article II, Sections 1 and 2. This court noted:

> Article II, §1 of the Tennessee Constitution provides that the powers of government are to be divided into the Legislative, Executive, and Judicial Departments. In general, the "legislative power" is the authority to make, order, and repeal law; the "executive power" is the authority to interpret and apply law; and the "judicial power" is the authority to interpret and apply law. The Tennessee Constitution provision prohibits an encroachment by any of the departments upon the powers, functions and prerogatives of the others . . . . The branches of government, however, are guided by the doctrine of checks and balances; the doctrine of separation of powers is not absolute....

Brackett, 869 S.W.2d at 939 (citations omitted). The court also noted that Article II, Section 2 states, "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." Brackett, 869 S.W.2d at 940 n.3. In addressing the defendant's claim, the court noted that the supreme court has the authority to enact rules for our courts, T.C.A. § 16-3-402, and that the rules are approved by resolution of the General Assembly. T.C.A. § 16-3-404. Thus, the court concluded:

> The rule to which the defendant objects in this instance was, of course, initiated by the supreme court as a means of improving the criminal procedure in this state. Because the judiciary promulgated and the Legislature approved the rule granting the prosecution the right to reject a non-jury proceeding in the general sessions court, we find no intrusion by either of the other branches of government.

Brackett, 869 S.W.2d at 939-40.

We conclude that the reasoning of Brackett applies here as well. The district attorney general is given statutory authority to prosecute criminal cases in his or her jurisdiction. T.C.A. § 8-7-103(1). When the death penalty will be sought in a first degree murder case, the prosecutor must afford notice to the

-32-

defendant of the intent to seek the death penalty, as well as notice regarding the aggravating factors that will be relied upon. Tenn. R. Crim. P. 12.3(b). Thereafter, the proceedings are governed by the provisions passed by the Legislature in T.C.A. § 39-13-204. The defendant in this case has not shown, nor has he cited authority to show, that this functioning violates the separation of powers doctrine under Tennessee law. This issue is without merit.

Third, the defendant argues that the death penalty statute has been imposed discriminatorily on the basis of economics, race, gender and geographic region in the state. This argument has been rejected by the supreme court. See Brimmer, 876 S.W.2d at 87 n.5; Cazes, 875 S.W.2d at 268; Smith, 857 S.W.2d at 23; State v. Evans, 838 S.W.2d 185, 196 (Tenn. 1992). Moreover, the record is devoid of evidence indicative of an individualized showing of improper discrimination with regard to the sentencing of the defendant in this case. See, e.g., McCleskey v. Kemp, 481 U.S. 279, 292-93, 107 S. Ct. 1756, 1767 (1987); Cooper, 847 S.W.2d at 531.

Fourth, the defendant submits that the failure to create a uniform system of jury selection results in unequal treatment for capital defendants and necessarily results in arbitrary and capricious imposition of the death penalty. Specifically, the defendant contends that all capital defendants should be guaranteed individual sequestered voir dire and a questioning process which would maximize the prospective jurors' candor.

Our supreme court has rejected the argument that the lack of uniform procedures mandating individual sequestered voir dire during jury selection renders the imposition of the death penalty arbitrary and capricious. In Cazes, 875 S.W.2d at 269, the court concluded, without discussion, that this argument had been previously rejected in Caughron, 855 S.W.2d at 542. Further, the court has said that the "ultimate goal of voir dire is to insure that jurors are

-33-

competent, unbiased and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." Cazes, 875 S.W.2d at 269. See also Black, 815 S.W.2d at 180. In this case, the defendant has not challenged any of the jurors selected or the manner in which the trial court conducted voir dire. This issue is without merit.

Fifth, the defendant argues that the manner of selecting "death qualified" jurors results in juries that are prone to conviction. In State v. Teel, 793 S.W.2d 236, 246 (Tenn. 1990), cert. denied, 498 U.S. 1007 (1990), however, our supreme court stated that "[t]his argument has been rejected by both the Tennessee and United States Supreme Court." See also State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986). The defendant has not offered any evidence in which to substantiate his claim, nor has he presented a principled basis with which to distinguish the supreme court holdings in this area.

Sixth, the defendant contends that capital defendants should be allowed to address jurors' popular "misconceptions" concerning parole eligibility, the cost of incarceration versus the cost of execution, general deterrence, and the method of execution in order to avoid arbitrary decision making. This argument, however, has been rejected on several occasions by our supreme court. See Black, 815 S.W.2d at 179; See also Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268. Moreover, the defendant did not present any evidence with respect to his contentions.

As his seventh argument, the defendant submits that it is constitutional error to instruct juries that they must agree unanimously in order to impose a life sentence and to prohibit juries from being told the effect of a nonunanimous verdict. See T.C.A. § 39-13-204(h). However, this contention also has been repeatedly rejected by the supreme court. See Brimmer, 876 S.W.2d at

-34-

87; <u>Cazes</u>, 875 S.W.2d at 268; <u>Smith</u>, 857 S.W.2d at 22-23; <u>Barber</u>, 753 S.W.2d at 670-71.

Relative to this issue, the defendant contends that requiring the jury to agree unanimously to a life verdict violates the holding in <u>McKoy v. North Carolina</u>, 494 U.S. 433, 110 S. Ct. 1227 (1990), and in <u>Mills v. Maryland</u>, 486 U.S. 367, 108 S. Ct. 1860 (1988). The claim has been held to be without merit under Tennessee law. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87; <u>Thompson</u>, 768 S.W.2d at 250; <u>State v. King</u>, 718 S.W.2d 241, 249 (Tenn. 1986). In <u>Brimmer</u>, the court noted that <u>McKoy</u> and <u>Mills</u> stand for the principle that any requirement that the jury must unanimously find a mitigating circumstance before it can be considered violates the Eighth Amendment. The court went on to state that the unanimous <u>verdict</u> instruction does not violate these principles. <u>Brimmer</u>, 876 S.W.2d at 87. <u>See also</u> <u>Teel</u>, 793 S.W.2d at 252. In any event, the trial court in the present case instructed the jury that there was no requirement for jury unanimity or agreement as to any particular mitigator. Also, it followed with instructions for each juror to decide the case individually and for each to know that they were <u>not</u> required to reach a unanimous verdict regarding mitigators or their weight. Thus, the concerns expressed in <u>McKoy</u> and <u>Mills</u> are not present in this case.

Eighth, the defendant argues that the Tennessee Pattern Jury Instructions create a reasonable likelihood that jurors are led to believe they must unanimously agree on the existence of any mitigating factors. The supreme court has repeatedly rejected this argument. <u>See</u> <u>Brimmer</u>, 876 S.W.2d at 87; <u>Cazes</u>, 875 S.W.2d at 268. Moreover, the trial court instructed the jury that "[t]here is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance." It is a well-established rule in Tennessee that a jury is presumed to have followed the instructions of the trial court. <u>State v. Lawson</u>, 695 S.W.2d 202, 204 (Tenn. 1985).

-35-

Ninth, the defendant claims that the statute fails to require that the jury make the ultimate determination of whether death is the appropriate penalty in a specific case. This argument has likewise been rejected by the supreme court. See Brimmer, 876 S.W.2d at 87; Smith, 857 S.W.2d at 22. The defendant's claim that there is no weighing process for aggravating and mitigating factors is also without merit. In State v. Bane, 853 S.W.2d 483, 488 (Tenn. 1993), the supreme court said that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is not constitutionally required."

As his tenth and final argument in support of his contention that the death penalty is imposed arbitrarily and capriciously in Tennessee, the defendant contends that once an aggravating circumstance is proven, the burden of proof shifts to the defendant to present mitigating evidence. Therefore, the defendant argues, it is constitutional error to deny the defense the right to give the final closing argument in the penalty phase. This issue has been rejected by the supreme court on numerous occasions. See Brimmer, 876 S.W.2d at 87 n.5; Cazes, 875 S.W.2d at 269; Smith, 857 S.W.2d at 24; Caughron, 855 S.W.2d at 542. In Smith, the court said that the "order [of argument] is not inherently prejudicial to the defendant or favorable to the state in its use at the sentencing stage of a death penalty proceeding." Smith, 857 S.W.2d at 24.

### (c)

In another challenge to the death penalty statute, the defendant argues that electrocution is cruel and unusual punishment, therefore, violating the Eighth Amendment of the United States Constitution and Article I, Section 16 of the Tennessee Constitution. Our supreme court rejected this argument in Black, 815 S.W.2d at 179, and has since reaffirmed its holding on several occasions. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994); Cazes, 875 S.W.2d at 268; Howell, 868 S.W.2d at 258; Smith, 857 S.W.2d at 23; Bane, 853 S.W.2d at 489.

**(d)**

The defendant argues that the appellate review process in death penalty cases is constitutionally inadequate in its application.  He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete and because the appellate courts' methodology of review is flawed.  This argument has been specifically rejected by our supreme court on numerous occasions. Cazes, 875 S.W.2d at 270-71; see also State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992); Barber, 753 S.W.2d at 664.

Moreover, the defendant contends that the statutorily mandated proportionality review is conducted in violation of due process and the law of the land.  He argues that there is no comprehensive procedure for gathering information in capital cases and no published set of criteria for the review.  In support of his claim, the defendant argues that since the promulgation of the current statute in 1977, the supreme court has found no death sentence to be imposed in a disproportionate manner.[28]

As previously noted, the appellate review provided for in the statute has been held to afford a meaningful proportionality review.  Brimmer, 876 S.W.2d at 87-88; Cazes, 875 S.W.2d at 270-71.  Moreover, our supreme court has relied upon and upheld the use of trial court reports in capital cases pursuant to Rule 12, Tennessee Supreme Court Rules.  In Harris, 839 S.W.2d at 77, the court noted that it has considered the information in such reports and that, because no two cases or defendants are exactly alike, each review for proportionality must be based on the individual defendant and the nature of the crime.  See also Cazes,

---

[28] We note, however, that in State v. Branam, 855 S.W.2d 563 (Tenn. 1993), the supreme court found the death penalty to be disproportionate and reduced the defendant's sentence to life.  Id. at 570-71.

-37-

875 S.W.2d at 270-71 (Rule 12 report not prepared; supreme court's review for proportionality based on its thorough review of the record and Rule 12 reports in other cases).  Accordingly, the defendant is not entitled to relief on this basis.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the defendant's conviction for first degree murder and sentence of death are affirmed.

_____
                                                              Joseph M. Tipton, Judge

___
CONCUR:


_____
Gary R. Wade, Judge


_____
John H. Peay, Judge