IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 2, 2019

**STATE OF TENNESSEE v. WESLEY DAWONE COLEMAN**

**Appeal from the Circuit Court for Hardeman County**
**No. 16-CR-04      J. Weber McCraw, Judge**

_____

**No. W2018-01609-CCA-R3-CD**

_____

The Defendant, Wesley Dawone Coleman, appeals his conviction for first degree premeditated murder, for which he received a sentence of life imprisonment. On appeal, the Defendant asserts that the trial court erred in excluding lay testimony regarding an unwritten code followed by prison inmates and the possible risks of violating the code. Upon reviewing the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Matthew C. Edwards, Bolivar, Tennessee, for the Appellant, Wesley Dawone Coleman.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Mark E. Davidson, District Attorney General; and Falen Chandler and Lisa Miller, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

The evidence presented at trial established that the Defendant, an inmate at Hardeman County Correctional Facility, severely beat and killed his cellmate, Mr. Floyd Perrow, on the morning of December 12, 2012. Both the Defendant and the victim were awake inside their cell when correctional officers conducted a physical count of the inmates at approximately 5:15 a.m. on December 12. Once the physical count was completed after 6:00 a.m., the doors were opened, and the inmates were allowed out of

their cells. At approximately 6:25 a.m., correctional officers discovered the victim dead inside the cell.

The victim was lying face down on the floor and covered in blood. He had swelling on his face, multiple lacerations, and bruising. The victim did not have any vital signs, so Ms. Amy Olive, a nurse, initiated CPR until an ambulance arrived. Ms. Olive noted that the victim's ribs appeared to have been fractured. Once a paramedic arrived, he advised Ms. Olive to stop CPR because the victim showed no signs of life.

Sergeant Mary Robertson and other officers began searching for the Defendant. The Defendant was found in the hallway returning from the dining hall. He had blood on his shoes and was escorted by officers to the medical area. He remained calm and "[n]onchalant" when interacting with the officers. He did not have any cuts or scratches on him, and he had three brownish-red stains on his pants. The Defendant's boots and pants were sent to the Tennessee Bureau of Investigation ("TBI") for testing. The victim's blood was on the Defendant's left boot. The DNA profile obtained from blood stains on the Defendant's pants was consistent with a mixture of at least two individuals, and the victim was the major contributor of the profile.

Internal Investigator Kelsey Gates reviewed video camera footage of the area. She saw two officers conduct a count of the Defendant and the victim at approximately 5:15 a.m. She later saw the Defendant exit the cell and go to the shower area. He then returned to the cell before exiting again. Investigator Gates saw an inmate go over to the cell and then waive his arms to get the attention of the officer in the control booth.

Mr. Roy Wakefield was an inmate at the prison, and his cell was located directly below the cell of the Defendant and the victim. Mr. Wakefield testified that he was awakened by noise from the cell of the Defendant and the victim and said it sounded as if they were attempting to "bust boulders on the floor." The noise continued for two and one-half to three minutes. Mr. Wakefield looked at his watch, saw a "1," and surmised that the noise occurred between 10:00 p.m. and 1:00 a.m. He stated that if he gave a statement the following day that the noise occurred between 5:30 a.m. and 6:00 a.m., his statement was not correct.

Special Agent Nickey Jordan with the Tennessee Department of Correction ("TDOC") investigated the victim's death. When he entered the cell, he saw the victim lying on his back and surrounded by a large pool of blood. A white cloth or t-shirt was wrapped around the victim's neck. Special Agent Jordan pulled back the white cloth and saw a "burn" mark that appeared to be a ligature mark on the front of the victim's neck. He stated that the white cloth appeared to have been used as a choking device. The victim had a large amount of trauma to his face and hemorrhaging in his eyes. He had

blood in his mouth, and blood from his wounds had drained into his ears. Special Agent Jordan turned the victim over and noticed that the back of his head was "kind of caved in."

Special Agent Jordan went to the medical facility and spoke to the Defendant. The Defendant declined to make a statement and appeared "very calm." Special Agent Jordan photographed the Defendant and did not observe any injuries on his face, stomach, chest, back, arms, or legs.

Dr. Erica Curry, a forensic pathologist, performed the victim's autopsy. She concluded that his cause of death was strangulation and blunt force trauma and that his manner of death was homicide. She noted that the victim had multiple lacerations on his face and under his chin. He had scrapes on his chest, broken ribs, and hemorrhaging around his heart, which Dr. Curry stated could have resulted from a beating or from attempts to resuscitate him. The victim had a skull fracture that was consistent with blunt force trauma, such as someone banging his head onto a concrete floor. The bone connecting the spine and the skull was dislocated, and there was bruising on the frontal lobe and both sides of his brain.

Dr. Curry observed a mark that encircled the victim's neck and believed that it was caused by the cloth found around his neck. Dr. Curry measured the distance from the beginning of the mark to the top of the victim's head and concluded that the cloth was pulled upward and to the right when the injury was inflicted. Dr. Curry observed hemorrhaging in the muscle on one side of the victim's neck and around the hyoid bone and noted that the hyoid bone was fractured. She stated that the hemorrhaging indicated that the victim was alive when the injuries were inflicted. She also stated that a large amount of force would have been required to break the hyoid bone and dislocate the bone connecting the spine and the skull.

The Defendant testified in his own defense and acknowledged that he previously had been convicted of aggravated burglary, assault, and theft. He stated that he and the victim shared a cell for approximately six months. When the Defendant first moved into the cell, "it was kind of weird," but he "tried to get past it, just cope with him." Their relationship worsened over time. The Defendant maintained that the victim began to steal from him and sexually assault him but that the Defendant attempted to ignore the situation because he was about to be released on parole.

The Defendant testified that the victim sexually assaulted him on three occasions. The Defendant stated that he spoke to the counselor, the unit manager, and other inmates about the assaults and that he was told that reporting the assaults would only draw attention to him and would make him a target for assaults by other inmates. The

Defendant maintained that he was afraid of the victim and that he was unable to defend against the victim during the first two occasions because he was weak from fasting.

The Defendant testified that on the third occasion, the victim stated that the Defendant either had to have sex with him or fight him. The Defendant said that after he got out of his bunk and as he was attempting to put on his boots, the victim ran up to him and hit him across his chin. They began to "tussle," and the victim got the Defendant down onto the floor. The Defendant stated that he grabbed the victim's leg and wrestled him down on the floor. The Defendant testified, "I didn't get up off him ever since then. In the same place of almost where they found him is where it actually took place."

On cross-examination, the Defendant testified that he used his boots to stomp the victim's head into the concrete floor. The Defendant stated that the victim was still breathing, so to "relieve" the victim, he tied a sheet around the victim's neck and "left it." He maintained that he was unsure whether the victim was alive or dead when he did so. The Defendant acknowledged that he intended to kill the victim.

In rebuttal, the State recalled Officer Robertson, who testified that the victim was passive and stayed to himself. She described the Defendant as "an aggressor" who attempted to control the entire cell. She had witnessed the Defendant bullying the victim on a prior occasion.

The jury convicted the Defendant of first degree premeditated murder, and the trial court imposed a sentence of life imprisonment. The Defendant filed a motion for new trial, which the trial court denied. The Defendant appeals.

## ANALYSIS

The Defendant's sole challenge on appeal is that the trial court erred in excluding Special Agent Jordan's testimony regarding an unwritten code followed by prison inmates and the possible risks of violating the code. The Defendant maintains that the evidence was admissible as lay testimony and was relevant to his claim of self-defense.

In response to questioning by defense counsel on cross-examination, Special Agent Jordan testified that he had worked for TDOC for thirty-four years and had been an investigator since 2010. Defense counsel asked him whether there were two sets of rules in prison, one set implemented by TDOC and one set implemented by the inmates themselves. Special Agent Jordan stated that he "agree[d] somewhat that that's true." Defense counsel asked Special Agent Jordan,

- 4 -

If a person is sexually assaulted from your experience and in your I'm going to say expert opinion as the investigator for TDOC, if a person is sexually assaulted by another inmate and other inmates … find out about that, does that make them more prone to be targeted for other sexual assaults?

The State objected, arguing that Special Agent Jordan "would have no way of knowing that" and that he had not been qualified as an expert. The trial court agreed with the State but allowed defense counsel to continue questioning Special Agent Jordan about his qualifications.

After questioning Special Agent Jordan further regarding his qualifications, defense counsel requested that the trial court accept Special Agent Jordan as an expert in prison policies, criminal investigations in prisons, and the daily operations of a prison. The State acknowledged that Special Agent Jordan understood the daily operations of a prison but argued that he was not qualified to testify regarding an "in-house code" followed by prison inmates. The trial court agreed with the State but allowed defense counsel the opportunity to question Special Agent Jordan further in an effort to qualify him as an expert witness. Defense counsel declined and questioned Special Agent Jordan on other matters.

While the Defendant contends on appeal that Special Agent Jordan's testimony was admissible as lay testimony, the Defendant did not raise this argument at trial and only sought to have the testimony admitted as expert testimony. "It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal." *State v. Adler*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001).

The Defendant also failed to make an offer of proof regarding what Special Agent Jordan's testimony would have been had the trial court allowed him to testify. Error may not be predicated upon a ruling excluding evidence unless "a substantial right of the party is affected" and "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context." Tenn. R. Evid. 103(a)(2). An offer of proof is a means by which to ensure "effective and meaningful appellate review." *State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997). "[G]enerally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded." *Id.*

In the present case, the State argued at trial that Special Agent Jordan had no knowledge of the information that defense counsel sought to procure, and Special Agent Jordan only "agreed somewhat" that prison inmates have a separate set of rules by which they adhere. The record does not reflect what Special Agent Jordan's answer would have

been to defense counsel's question as to whether an inmate who was sexually assaulted would be targeted by other inmates or what other information that he would provide regarding any separate rules to which inmates adhere.  The Defendant's failure to make an offer of proof precludes effective and meaningful appellate review of the issue.  Because the Defendant changed theories regarding the admissibility of the evidence on appeal and failed to make an offer of proof, the issue is waived, and the Defendant is not entitled to relief.

## CONCLUSION

Upon reviewing the record and the applicable law, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE